## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **ED TOBERGTE ASSOCIATES COMPANY d/b/a GEAR 2000, an Ohio corporation,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **CIVIL ACTION NUMBER: 2:08-cv-02290-JWL-GLR** |
| **RUSSELL CORPORATION, a Delaware corporation, n/k/a RUSSELL BRANDS, LLC, a Delaware Limited Liability Company** | ) ) ) ) ) | |
| **Defendant.** | | |

### RUSSELL BRANDS LLC'S INITIAL CLAIMS CONSTRUCTION BRIEF

Russell S. Jones, Jr.
Richard P. Stitt
Joshua M. McCaig
POLSINELLI SHUGHART PC
120 West 12th Street, Suite 1600
Kansas City MO 64105

Paul M. Sykes
Nathan W. Johnson
Edward J. Everitt
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

I.      Introduction ........................................................................................................... 1

II.     Issues Presented ..................................................................................................... 4

III.    The Law of Claims Construction ........................................................................... 5

        A.      Intrinsic Evidence is the Primary Source for Claims Construction ......... 5

                1.      The Claims Themselves Provide Guidance ................................. 6

                2.      The Specification is Highly Relevant .......................................... 6

                3.      The Prosecution History is of Critical Significance in Determining the
                        Meaning of Disputed Terms ........................................................ 7

        B.      Extrinsic Evidence May Be Considered ................................................... 8

        C.      Means Plus Function Claims ..................................................................... 8

        D.      All Disputed Claim Terms Should Be Construed ..................................... 8

IV.     Claim Terms/Phrases – Claim 11 .......................................................................... 9

        A.      Breathable Torso Pad Member .................................................................. 9

        B.      Breathable Foam ..................................................................................... 11

        C.      Airflow Through ...................................................................................... 16

        D.      Substantially Throughout [the Torso Pad's] Area .................................. 18

V.      Means Plus Function Elements in Claims 12, 13, 15, and 16 ............................. 21

        A.      "Means For Releasably Securing" in Claim 12 ...................................... 22

        B.      "Means For Securing" in Claim 13 ......................................................... 23

        C.      "Means For Accessorizing" in Claim 15 ................................................ 25

        D.      "Means For Accessorizing" in Claim 16 ................................................ 26

VI.     Conclusion ........................................................................................................... 27

        CERTIFICATE OF SERVICE ............................................................................. 29

# TABLE OF AUTHORITIES

**Cases**

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
448 F.3d 1324 (Fed. Cir. 2006)...................................................................... 8

*Bell Atl. Network Servs., Inc. v. Covad Comm'ns Group, Inc.*,
262 F.3d 1258 (Fed. Cir. 2001)...................................................................... 6

*Bristol Meyers Squibb Co. v. Ben Venue Laboratories, Inc.*,
246 F.3d 1468 (Fed. Cir. 2001)...................................................................... 16

*Chimie v. PPG Indus., Inc.*,
402 F.3d 1371 (Fed. Cir. 2005)...................................................................... 7

*Datamize, LLC v. PlumTree Software, Inc.*,
417 F.3d 1342 (Fed. Cir. 2005)................................................................ 3, 21

*Halliburton Energy Servs., Inc. v. MI-LLC*,
514 F.3d 1244 (Fed. Cir. 2008)................................................................ 3, 4

*Harris Corp. v. IXYS Corp.*,
114 F.3d 1149 (Fed. Cir. 1997)...................................................................... 15

*Honeywell Int'l, Inc. v. Universal Avionics Sys.*,
493 F.3d 1358 (Fed. Cir. 2007)...................................................................... 6

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
341 F.3d 1132 (Fed. Cir. 2003)...................................................................... 21

*Johns Hopkins Univ. v. Cellpro, Inc.*,
152 F.3d 1342 (Fed. Cir. 1998)...................................................................... 15

*K-2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed.Cir.1999)........................................................................ 12

*Markman v. Westview Instruments, Inc.*,
52 F.2d 967 (Fed. Cir. 1995) (en banc),
*aff'd*, 517 U.S. 370 ............................................................................ 5, 6, 8

*Nystrom v. Trex Co.*,
424 F.3d 1136 (Fed. Cir. 2005)...................................................................... 6

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
521 F.3d 1351 (Fed. Cir. 2008)...................................................................... 9

*Omega Engineering, Inc. v. Raytek Corporation,*
    334 F.3d 1314 (Fed. Cir. 2003)..................................................................... 8

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)............................................................... 6, 7, 8

*Rheox, Inc. v. Entact, Inc.,*
    276 F.3d 1319 (Fed. Cir. 2002)................................................................... 15

*Sage Prods., Inc. v. Devon Indus. Inc.,*
    126 F.3d 1420 (Fed. Cir. 1997)................................................................... 12

*Seachange, Int'l, Inc. v. C-Cor, Inc.,*
    413 F.3d 1361 (Fed. Cir. 2005)..................................................................... 7

*Spectrum Int'l, Inc. v. Sterilite Corp.,*
    164 F.3d 1372 (Fed. Cir. 1998)................................................................. 7, 14

*Toro Co. v. White Consol. Indus., Inc.,*
    199 F.3d 1295 (Fed. Cir. 1999)..................................................................... 9

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)...................................................................... 7

*ZMI Corp. v. Cardiac Resuscitator Corp.,*
    844 F.2d 1576 (Fed. Cir. 1988)..................................................................... 7

## Statutes

35 U.S.C. § 112.............................................................................................. passim

## Other Authorities

A New English Dictionary on Historical Principles 375 (1919) ......................................... 19

American Heritage Dictionary of the English Language (3d ed. 1992)........................... 19

Random House Dictionary of the English Language, 1977 (2d ed., unabridged, 1987).... 19

Webster's New Twentieth Century Dictionary (unabridged ed. 1957) ........................ 17, 19

Webster's New World College Dictionary 1395 (3d ed. 1997) ......................................... 19

Pursuant to paragraph 4(f)(3) of the Court's Scheduling Order (Doc. 27), Defendant Russell Brands LLC ("Russell") submits this Claims Construction Brief. By proposing construction of the claims at issue, Russell does not waive and hereby reserves all defenses as to the invalidity of the claims, including that the claims are indefinite and not susceptible to construction.

## I.    INTRODUCTION

This case is about football shoulder pads. In particular, it involves a claim by Plaintiff Ed Tobergte Associates Company ("Gear 2000") that certain shoulder pads sold by Russell infringe U.S. Patent 7,168,104 (attached as Exhibit A).

The '104 Patent describes a lightweight and breathable football shoulder pad. The patentee Gear 2000 claims that its breathable shoulder pad solves the problem of an athlete's decreased performance from the body heat and perspiration contained by conventional pads. Ex. A, '104 Pat., 1:5-6, 32-37. According to Gear 2000, conventional shoulder pads are made with a hard outer shell and an inner layer of padding next to the athlete. Gear 2000 explained that typical padding materials, including "*closed cell foams . . .* , do not allow body heat to be released and thus, are very warm when worn by an athlete." *Id.*, 1:28, 32-34 (emphasis added). Likewise, "[t]he hard outer shell prevents airflow into and/or perspiration evaporation away from the athlete's body." *Id.*

In contrast to conventional or prior art pads, the football shoulder pad of the '104 Patent is constructed of "breathable" torso pads having three layers:  (1) a central, rigid layer; (2) an outer layer of "breathable, lightweight foam"; and (3) an inner layer of "breathable, lightweight foam." *Id.* 1:66-2:3. The central, rigid layer is sandwiched between the breathable foam layers, and it has holes stamped through it to allow air and moisture to flow through the torso pads. *Id.* 2:3-7. Claim 11, the sole independent claim at issue in this litigation, includes these three layers

and also requires "airflow through [the] torso pad member substantially throughout its area." The characteristics of "breathable foam" as claimed in the patent and the functional requirement of allowing airflow "substantially throughout [the torso pad's] area" were critical in prosecution of the patent application and will be critical in this litigation.

When the United States Patent Office rejected the claims of the '104 Patent application during prosecution, Gear 2000 distinguished prior art pads cited by the Examiner based both upon the breathability of the foam padding material, and upon the breathability of the torso pads as a whole. The Examiner cited an earlier patent by Bassett, which taught a three-layer sports pad having a rigid central layer sandwiched between soft foam layers constructed of *closed cell* foam. *See* Ex. B hereto, U.S. Pat. 5,781,935 (hereinafter, "Bassett"). Bassett also explained that cutouts or holes could be aligned through the various layers of the pad, including the central rigid layer and the closed cell foam padding layers, for ventilation. Bassett, 4:11-15, Figs. 4-5.

When faced with this rejection, Gear 2000 amended the claims to emphasize the breathability of the pad as a whole "to allow airflow through [the] torso pad member substantially throughout its area." Gear 2000 pointed out that it claimed "breathable foam" while Bassett contemplated only "**nonbreathable** materials," such as "closed cell type foam," with cutouts in it for ventilation. Ex. C, Amendment (10/19/2005), p. 11 (emphasis in original).[1] The argument continued: "Nothing [in Bassett] suggests that the cutouts would make the **padding** breathable. Put another way, the **cutout** will allow ventilation through the cutout **only,** but the padding still would not provide any air or moisture transfer." *Id.* (emphasis in original).

Gear 2000 clearly disclaimed ventilation or airflow through holes in closed cell foam as being outside the scope of the invention. Instead, Gear 2000 represented to the USPTO and the

---

[1] For the convenience of the Court, the complete prosecution history of the '104 Patent is attached hereto as Exhibit H.

public that the claims require that the *padding material itself*—not holes or cutouts in it—be "breathable."

In this litigation, however, and contrary to well-settled law, Gear 2000 is trying recapture this disclaimed subject matter because the Russell pads at issue are constructed like the Bassett pad cited by the Examiner.  The Russell pads use *closed cell* foam with cutouts in it, and thus there is ventilation only through the cutouts, not in the padding.  Further, substantial areas of the Russell shoulder pads—from one-half to the all of the front side of the torso pad depending on the design—are covered with closed cell foam with no cutouts whatsoever, such that it is impossible that there could be "airflow substantially throughout [the torso pad's] area."

Before moving into the claims construction itself, Russell must first note that the key elements of the claim render it indefinite. The underlined portion of the phrase "allow airflow through [the] torso pad member <u>substantially throughout its area</u>" was added by amendment. Neither this phrase nor a definition of it appears in the specification of the patent. The claims also require a "breathable torso pad member" made of "breathable foam."  The problem is that these limitations purport to define the invention by *what it does*, not by *what it is*.  How much airflow is enough? Over how much area of the torso pad must this airflow exist?  Who determines what "breathable" is?  The specification completely fails to offer any objective standard or guidance by which a potential competitor can make these determinations.  The Federal Circuit has recently found that such deficiencies render claims invalid under 35 U.S.C. § 112. *See Datamize, LLC v. PlumTree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) ("Some objective standard must be provided in order to allow the public to determine the scope of the claimed invention. . . . While beauty is in the eye of the beholder, a claim term, to be definite, requires an objective anchor."); *Halliburton Energy Servs., Inc. v. MI-LLC*, 514 F.3d

3

1244, 1249 (Fed. Cir. 2008) ("Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, *i.e.*, what subject matter is covered by the exclusive rights of the patent. Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims."); *see also id.* at 1255 (warning of the danger of indefiniteness in using functional claim language, that is, defining invention "by what it does rather than what it is" (internal quotation and citation omitted)).

Accordingly, Russell submits that no objective, meaningfully precise construction of the claims is possible, and the claims are invalid as indefinite. Nevertheless, and without waiver of this defense, Russell will propose claim constructions for the terms and phrases in dispute.

## II.    ISSUES PRESENTED

Gear 2000 has asserted Claims 11-21 against Russell in this case. Claim 11, the sole independent claim at issue in the case, reads as follows (terms added by amendment during prosecution are underlined):

> 11. Football shoulder pads, comprising:
> a <u>breathable</u> torso pad member <u>of said shoulder pads</u> having a front portion, a back portion and a shoulder portion;
> said <u>breathable</u> torso pad member further including a foam body having a hard, inner layer and first and second layers of breathable foam secured to opposing surfaces of said hard inner layer, said layers presenting a sandwich configuration;
> said hard inner layer having spaced apart openings therethrough to allow airflow through said torso pad member <u>substantially throughout its area</u>.

Russell requests the Court to construe the following phrases from Claim 11:

- **breathable torso pad member**

- **breathable foam**

- **airflow through**

- **substantially throughout its [the torso pad's] area**

The third and fourth phrases above are part of the same clause: "allow airflow through said torso pad member substantially throughout its area." Russell therefore also requests that this clause be construed as a whole, consistent with the definitions of its constituent parts.

Dependent claims 12, 13, 15, and 16 include the following means-plus-function elements that Russell requests be construed:

- **means for releaseably securing** (claim 12)

- **means for securing** (claim 13)

- **means for accessorizing** (claim 15)

- **means for accessorizing** (claim 16)

The parties have previously identified those terms and phrases they contend require claims construction and proposed exchanged definitions. While both parties recognize the Court must construe the means plus function elements, Gear 2000 proposes that all other claim terms be given their plain and ordinary meaning. In doing so, Gear 2000 now seeks to ignore the amendments it made in the claims, and the representations it made to the USPTO and the public, during prosecution of the '104 Patent. Russell respectfully requests the Court to hold Gear 2000 accountable for these representations and limit the scope of the claims accordingly.

## III.    THE LAW OF CLAIMS CONSTRUCTION

### A.    Intrinsic Evidence is the Primary Source for Claims Construction

Claim construction is an issue of law for the Court. *Markman v. Westview Instruments, Inc.*, 52 F.2d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370. To construe the

5

claims, courts are to look primarily to three sources of intrinsic evidence: the claims themselves, the specification, and the prosecution history. *Markman*, 52 F.3d at 979.

### 1. The Claims Themselves Provide Guidance

The claims themselves provide substantial guidance as to the meaning of a particular claim term. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). While the starting point of claims construction is to give the claim term its ordinary meaning, *id.* at 1313, a patentee can give the claim term a special meaning or limit its scope in the specification and prosecution history. A construction is improper if it divorces the claim language from the specification or the prosecution history. *Nystrom v. Trex Co.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005).

### 2. The Specification is Highly Relevant

The claims are part of " 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims." *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 978). Therefore, the claims must be read in view of the specification. *Id.* (quoting *Markman*, 52 F.3d at 979). A patentee may also act as his own lexicographer and define a claim term, either expressly or by implication, in the specification. *Id.* at 1321 ("[T]he specification is the single best guide to the meaning of a disputed term, and . . . the specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." (citations and quotation marks omitted)); *Honeywell Int'l, Inc. v. Universal Avionics Sys.*, 493 F.3d 1358, 1361-62 (Fed. Cir. 2007) ("A claim term may be defined in a particular manner for purposes of a patent even 'without an explicit statement of redefinition.' " (quoting *Bell Atl. Network Servs., Inc. v. Covad Comm'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001)).

### 3.    The Prosecution History is of Critical Significance in Determining the Meaning of Disputed Terms

The prosecution history, which includes the complete record before the USPTO as well as the prior art cited and distinguished during examination, also is "of critical significance in determining the meaning of the claims . . . ." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Phillips*, 415 F.3d at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent. Furthermore, like the specification, the prosecution history was *created by the patentee* in attempting to explain and obtain the patent." *Phillips*, 415 F.3d at 1317 (emphasis added).

Courts use the doctrine of prosecution disclaimer to limit the meaning of disputed claim terms to the representations made by the patentee to the USPTO during prosecution. *See*, *e.g.*, *Seachange, Int'l, Inc. v. C-Cor, Inc.*, 413 F.3d 1361, 1372-73 (Fed. Cir. 2005). Indeed, "[t]he purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.' " *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (quoting *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed. Cir. 1988)).

By distinguishing the claimed invention over the prior art, an applicant indicates what the claims do not cover, and by implication surrenders such protection. *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998). "[A] patentee, after relinquishing subject matter to distinguish a prior art reference asserted by the PTO during prosecution, 'cannot during subsequent litigation escape reliance [by the defendant] on this unambiguous surrender of subject matter.' Accordingly, '[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers.' " *Id.* at 1379 (citations omitted). That, of course, is exactly what Gear 2000 is attempting to do in this case.

7

## B.    Extrinsic Evidence May Be Considered

Courts may also rely on extrinsic evidence in construing claims, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980) (internal quotations omitted).  Dictionaries and treatises can be useful in claim construction. *Id.* at 1318.

## C.    Means Plus Function Claims

An applicant may elect to express an element of an invention by referring to the function performed without the recital of specific structure in the claim itself.  35 U.S.C. § 112, ¶ 6.  Such elements are typically called "means-plus-function" elements.  By statutory mandate, means-plus-function elements cover only "the corresponding structure, material, or acts described in the specification and equivalents thereof." *Id.*  Accordingly, interpretation of a means-plus-function element is a two-step process, requiring the court first to identify the function.  *Omega Engineering, Inc. v. Raytek Corporation*, 334 F.3d 1314, 1321 (Fed. Cir. 2003).  The court then looks to the specification to identify the corresponding structure in the written description of the patent that performs that function.  *Id.*; *Applied Med. Res. Corp. v. U.S. Surgical Corp.,* 448 F.3d 1324, 1332 (Fed. Cir. 2006).  In this second step, structures are considered to correspond to the function "only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim." *Omega Engineering*, 334 F.3d at 1321.

## D.    All Disputed Claim Terms Should Be Construed

While Gear 2000 has recognized that the means-plus-function claim terms noted above must be construed, it has not proposed any construction of any other claim term or phrase.  That is, Gear 2000 proposes that all terms from claim 11 be given their ordinary and plain meaning.  Gear 2000 is wrong.  The parties have a genuine dispute over the meaning of certain claim terms

and the resulting scope of the claims. When the parties raise an actual dispute over the scope of a claim term—even when that dispute revolves around seemingly common place terms—it is legal error for the district court to state that the plain meaning should apply and leave the construction of that term (a legal question) to the jury. *O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) (reversing district court where it refused to construe the term "only if" despite the parties' genuine dispute over its meaning and instead left its plain and ordinary meaning to be determined by the jury); *see also Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999) (construing the commonly understood terms "cover," "included," "attachment," and "removable"). The disputed terms in this case must be construed so that the parties and the jury have a clear understanding of their meanings. Further, the Court's claim construction will be fundamental to dispositive motions in this case.

## IV.     CLAIM TERMS/PHRASES – CLAIM 11

### A.     Breathable Torso Pad Member

| Disputed Claim Language | Russell's Proposed Construction | Gear 2000's Proposed Construction |
|---|---|---|
| **breathable torso pad member** | A torso pad that allows air or moisture to flow through the pad throughout its whole area | Plain meaning |

The plain meaning, specification, and prosecution history of the '104 Patent support the definition that a "breathable torso pad member" is one that "allows air or moisture to flow through the pad throughout its whole area."

With respect to plain meaning, the term "breathable" modifies "torso pad member"—the entire structure, not just some subpart or component of it identified elsewhere in the claim. Thus, the entirety of the torso pad member must be "breathable."

The prosecution history mandates this construction.  In an Office Action dated June 30, 2005, the Examiner rejected claims 1-11, 13-21, and 23-27,[2] in view of Bassett, either alone or combined with other references.  *See* Ex. D, Office Action (6/30/05).  At that time, claim 16 (now claim 11) recited only a "torso pad member."  In its response, the patentee amended the claim to require a "<u>breathable</u> torso pad member" and argued for allowance as follows[3]:

> Now, as amended, the claims further emphasize the breathability of the pad *as a whole*.  More specifically, claim 1 [and 16] has been amended to explicitly recite a **breathable** protective pad that allows air or moisture to flow **throughout** the pad's area.
> . . . Breathability and moisture transfer **across the pad** are not contemplated [by the prior art Bassett patent cited by the Examiner].

Ex. C hereto, Amendment (10/19/2005), p. 10 (bold emphasis in original; italics added).

As to the functional term "breathable" itself, the specification uses the term frequently but does not offer an explicit definition.  The specification does, however, describe various parts of the shoulder pad as "allowing air or moisture to flow through," or words to that effect.  *See* '104 Pat. 2:5-7 (openings in hard inner layer "allow air or moisture to flow through the foam body"); *id.* 3:57-60 (the layers cooperate "to allow air and moisture to pass through the foam body"); *id.* 3:63-66 (clearance between outer foam layer and outer arches "allows air or moisture to flow or disperse through this area of the shoulder pads").  As suggested by the specification, the term "breathable" is construed to mean "allows air or moisture to flow through".

In sum, the patentee explicitly amended the claim to add the limitation "breathable" as a modifier to the "torso pad member" element and argued this amendment was made "to

---

[2] Claim 11 in the '104 Patent as issued was numbered as Claim 16 during prosecution.

[3] In its Amendment of October 19, 2005, Gear 2000 made certain parallel amendments as to breathability in both claims 1 and 16.  It then explicitly incorporated its arguments with respect to Claim 1 into Claim 16.  *See* Ex. C hereto, Amendment (10/19/2005), pp. 10, 13 ("Claims 6, 16, and 27 have been amended to recite a breathable pad as discussed in detail above with respect to amended claim 1.  For the reasons discussed above with respect to Bassett as well as the reasons discussed here with respect to Beland, neither of these references, whether taken singularly or in combination, disclose or suggest applicant's invention as recited in amended claims 5, 6, 16, and 27.").

1/1905611.3

emphasize breathability of the pad as a whole."  In view of this prosecution history and the specification, the phrase "breathable torso pad member" must mean "a torso pad that allows air or moisture to flow through the pad throughout its whole area."

**B.     Breathable Foam**

| Disputed Claim Language | Russell's Proposed Construction | Gear 2000's Proposed Construction |
|---|---|---|
| **breathable foam** | A padding material that allows the flow of air or moisture through the padding itself and not merely through a hole or cutout in the padding. Breathable foam does not include a closed cell type foam. | Plain meaning |

The plain language, specification, and prosecution history each support the definition set forth above of "breathable foam."  The term "breathable foam" appeared in the claims as filed; is defined by the specification; and was the basis on which Gear 2000 distinguished prior art during prosecution.

The plain and ordinary meaning of "breathable foam" is a foam that breathes, *i.e.*, a foam that allows air or moisture to flow *through the foam* material itself.  The grammatical and literal context of the term in claim 11 supports this meaning.  In the claim, "breathable foam" is part of the phrase "first and second layers of breathable foam."  The placement of the adjective "breathable" as modifying "foam" is important; there is a significant difference between a "layer of breathable foam" and a "breathable layer of foam."  (As discussed below, this difference between a "breathable layer of foam" and a "layer of breathable foam" is one that Gear 2000 itself emphasized in the prosecution of the patent.)  Gear 2000 chose not to claim its invention as having "first and second *breathable layers* of foam."  Rather, Gear 2000 limited its claim to

11

layers made of a specific material: "breathable foam." Gear 2000 deliberately chose this structure to define its invention. It should not be allowed to change the plain meaning and broaden its claim by moving the placement of the word "breathable" to modify "layers," as it seeks to do in this litigation. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed.Cir.1999) ("Courts do not rewrite claims; instead, [they] give effect to the terms chosen by the patentee."); *see also Sage Prods., Inc. v. Devon Indus. Inc.*, 126 F.3d 1420, 1425 (Fed. Cir. 1997) ("[A]s between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who much bear the cost of its failure to seek protection for this foreseeable alteration of its claimed structure.").

The specification also offers guidance both as to what "breathable foam" is not—and as to what it is—that is consistent with the plain meaning. In describing materials used in the prior art, the specification states that typical padding materials, including "*closed cell foams . . .* , do not allow body heat to be released and thus, are very warm when worn by an athlete." '104 Patent, 1:28, 32-34 (emphasis added). Thus, according to the specification, closed cell foam clearly is not breathable foam. As to what is breathable foam, Gear 2000 describes a certain "Brock foam" as follows: "This foam circulates air in three dimensions. As the body sweats, the sweat coats the bead [of the Brock foam] which actually accelerates evaporation, body cooling, and drying." *Id.*, 3:37-43. The specification therefore implicitly defines "breathable foam" as circulating air in three dimensions and allowing evaporation, body cooling, and drying.

In the prosecution of the patent, Gear 2000 relied heavily upon the distinction between, on the one hand, a foam padding material that allows air or moisture to flow *through the padding material itself* and, on the other hand, a padding material that allows airflow only *through a hole*

in the material.  In the June 30, 2005, Office Action, the Examiner rejected the principal claims

of the patent, including claim 11 (then claim 16), in view of the Bassett patent and stated:

> Bassett . . . discloses a protective shoulder pad (20) that includes a foam body having a hard rigid inner layer (36) being positioned between first and second **breathable layers** of foam material (38, 42) in a sandwich configuration . . . .  Further, the hard rigid layer includes spaced openings/perforations therethrough as shown in figure 5 which can inherently be made of plastic.  Furthermore, the first and second foam layers are breathable with openings that align with the perforation of the inner layer, col. 4, lines 11-15.

Ex. D hereto, Office Action (6/30/05), p. 2, ¶ 2 (emphasis added).  Note that the Examiner

identified Bassett as having "*breathable layers* of foam" (*not* "breathable foam"), which layers

were made breathable by perforations or openings.

In response, Gear 2000 amended its claims and distinguished its invention as follows:

> The amended claims continue to recite first and second layers of **breathable** foam . . . .  Now, as amended, the claims further emphasize the breathability of the pad as a whole. . . .

> The object of the Bassett patent is to provide a patent that cushions not only the wearer but also another person/player coming into contact with the wearer.   Col. 1, lines 3-51.  Breathability and moisture transfer **across the pad** are not contemplated.  In fact, the Bassett patent discloses the opposite:  a **nonbreathable** pad **incapable** of air and moisture transfer across the pad's area.

> Basset discloses a **nonbreathable** pad having layers of **nonbreathable** materials. Padding layers 38 and 42 are disclosed as being closed cell type foam, such as VNS, which does not allow air and moisture transfer. . . .

> At col.4, lines 11-15, the Bassett patent contemplates including 'cutouts for ventilation or attachment of accessories.' . . . [M]odifying the Bassett pad to include a cutout that would allow air and moisture transfer across the pad's area would effectively eliminate the pad because the pad would become one big cutout. . . . Nothing suggests that the cutouts would make the **padding** breathable.   Put another way, the **cutout** will allow

13

> ventilation through the cutout **only**, but the padding still would not
> provide any air or moisture transfer.

Ex. C, Amendment (10/19/2005), p. 10-11 (emphasis in original).

It could not be clearer.  Gear 2000 unambiguously and explicitly stated that its invention was limited to layers of "**breathable** foam," and that "closed cell type foam" is a "**nonbreathable** material."  Gear 2000 even used **bold faced** font to emphasize to the USPTO that not just any foam would suffice, but only "**breathable** foam." Any ventilation provided by an opening or cutout in padding made of a closed cell foam does nothing to make that padding breathable—to allow the material of the closed cell foam padding itself to provide air or moisture transfer.  Ventilation or air transfer through the cutout only does not make closed cell foam breathable and is outside the scope of the claims.

This distinction was also present in the Examiner's statement of the reasons for allowance of the claims.  As explained above, the Examiner rejected the claims under Bassett because it disclosed a pad having "breathable layers of foam."  After Gear 2000's amendment and arguments, the Examiner stated among the reasons for allowance of the claims that the prior art did not show "first and second layers of breathable foam."  Ex. E, Notice of Allowance (10/24/2006), p. 2, ¶ 4.  Gear 2000 did not object to or otherwise comment on the reasons for allowance.

Gear 2000 undoubtedly will request the Court to allow it to recapture this disclaimed subject matter.  Specifically, Gear 2000 will ask the Court to construe the term "breathable foam" as including a nonbreathable foam material (closed cell foam) with perforations.  But that is exactly what Gear 2000 argued its patent claims did not cover in distinguishing Bassett.  *See Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d at 1379  ("[A] patentee, after relinquishing subject matter to distinguish a prior art reference asserted by the PTO during prosecution, cannot

14

during subsequent litigation escape reliance [by the defendant] on this unambiguous surrender of subject matter." (citations and internal quotations omitted)).

This distinction is critical to this case because the Russell pads at issue are like those of Bassett. The Russell pads include layers of closed cell foam with openings or cutouts in them for ventilation. "Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *See id.* Moreover, to construe "breathable foam" to include a perforated closed cell foam would bring Bassett within the scope of the claims, contrary to yet another fundamental principle of claims construction. *See Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1153 (Fed. Cir. 1997) ("[C]laims should be read in a way that avoids ensnaring prior art if it is possible to do so.").

While the specification of the '104 Patent identifies an alternative embodiment in which the foam layers are made of closed cell foam, '104 Pat. 3:47-56, there is no requirement that every embodiment disclosed in the specification be within the scope of the claims. *See Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1355 (Fed. Cir. 1998) ("A patent claim should be construed to encompass *at least one* disclosed embodiment in the written description portion of the patent specification." (emphasis added)); *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1327 (Fed. Cir. 2002) ("when the prosecution history requires a claim construction that excludes some but not all of the preferred embodiments, such a construction is permissible"). Any argument by Gear 2000 to the contrary is simply wrong.

Russell also expects Gear 2000 to rely upon the doctrine of claim differentiation, based upon claim 18, which depends from claim 11. Claim 18 provides as follows: "Football shoulder pads as claimed in claim 11 wherein *said layers of breathable foam* included spaced apart perforations therethrough with at least one said perforation in alignment with one said opening in

said hard, inner layer." (emphasis added).  The "layers of breathable foam" in claim 18 are the same as the layers of "breathable foam" in claim 11.  Claim 18 simply claims the same "breathable foam" with perforations in it.  There is no reason to construe "breathable foam" differently in claim 18 than in claim 11.  *See Bristol Meyers Squibb Co. v. Ben Venue Laboratories, Inc.*, 246 F.3d 1468 (Fed. Cir. 2001) (stating that doctrine of claim differentiation is not "a hard and fast rule" and finding multiple claims to be of identical scope under other canons of claims construction).

The plain language of the claim, the specification, and the prosecution history require that the term "breathable foam" be construed as follows:  "A padding material that allows the flow of air or moisture through the padding itself and not merely through a hole or cutout in the padding. Breathable foam does not include a closed cell type foam."

### C.    Airflow Through

| Disputed Claim Language | Russell's Proposed Construction | Gear 2000's Proposed Construction |
| --- | --- | --- |
| **airflow through** | Circulation of air or moisture, sufficient to effectively ventilate body heat or perspiration from the wearer, through one side of the torso pad, passing into one surface and out of the opposing surface of the padding material of the first and second foam layers, then passing out of the other side of the torso pad | Plain meaning |

The next term in claim 11 that Russell requests be construed is "airflow through," which is part of the clause "allow airflow through said torso pad member substantially throughout its area."  While this clause will need to be construed as a whole, Russell respectfully submits that it

16

is helpful to review constituent parts of the clause for plain meaning and in light of the specification and prosecution history.

As with several of the key terms in the claim, "airflow through" is a functional term, defining the invention by what it does rather than what it is. The plain meaning of the term "airflow" is of limited help in construing the term as used in the claim. "Airflow" is simply a flow of air. "Flow" implies movement or circulation. This is supported by dictionary definitions, such as WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY, which defines "airflow" as "allowing free flow or circulation of air." WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY 38 (unabridged ed. 1957).

The specification sheds more light on the term "airflow through." As noted above, in several places the specification describes the function of "air or moisture to pass through or flow through" the foam body of the pad. *See* '104 Pat., 2:5-7, 3:57-60, 3:63-66. The more important question, for a determination of infringement and therefore for purposes of claims construction, is a quantitative one: how much "airflow through" the torso pad is required by the claim? *See Datamize*, 417 F.3d at 1350 ("Some objective standard must be provided in order to allow the public to determine the scope of the claimed invention."). The object of the invention and Gear 2000's criticisms of the prior art provide some guidance here. Gear 2000 states that prior art pads "do not allow body heat to be released" and "prevent[] airflow into and/or perspiration evaporation away from the athlete's body." '104 Pat., 1:32-44. Thus, according to the specification, in order for the invention to accomplish its most basic purpose, there must be sufficient "airflow through" the torso pad to effectively ventilate body heat or perspiration from the wearer, through one side of the torso pad and out of the opposite side of the torso pad.

The prosecution history also supports this construction.  In responding to the USPTO's rejection of the claims at issue, Gear 2000 amended its claims "to explicitly recite a **breathable** protective pad that allows air or moisture to flow **throughout** the pad's area. . . . Breathability and moisture transfer **across the pad** are not contemplated [by the prior art Bassett patent cited by the Examiner]." Ex. C, Amendment (10/19/2005), p. 10 (emphasis in original).  Gear 2000 was explicit that air and moisture must flow "throughout the pad's area" and "across the pad." Gear 2000 distinguished the prior art based on this specific capability, and the claim must be so limited.

Russell's proposed claim construction of the phrase "airflow through" describes what is necessary to accomplish this result: "Circulation of air or moisture, sufficient to effectively ventilate body heat or perspiration from the wearer, through one side of the torso pad, passing into one surface and out of the opposing surface of the padding material of the first and second foam layers, then passing out of the other side of the torso pad."

### D.    Substantially Throughout [the Torso Pad's] Area

| Disputed Claim Language | Russell's Proposed Construction | Gear 2000's Proposed Construction |
|---|---|---|
| **substantially throughout its [the torso pad's] area** | Essentially everywhere in the torso pad | Plain meaning |

Claim 11 ends with the clause, "to allow airflow through said torso pad substantially throughout its area."  The phrase "substantially throughout its area," which was a new limitation added by amendment during prosecution, is critical to understanding the claim as a whole.

The plain meaning of "substantially throughout" is "essentially everywhere."  The definition of "throughout" as "everywhere" is supported by dictionaries:

- **throughout.**  *prep*. Quite through; in every part: from one extremity to the other; as, a general opinion prevails *throughout* England.  **throughout**  *adv*. In every part; as, the

cloth was smooth *throughout.* WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY 1786 (unabridged ed. 1957).

- **throughout.** *prep.* **1**. in or to every part of; everywhere in: *They searched throughout the house.* **2**. from the beginning to the end of: *He was bored throughout the play. --adv.* **3**. in every part: *rotten throughout.* **4**. at every moment or point: *following the text closely throughout.* RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, 1977 (2d ed., unabridged, 1987).[4]

- **throughout. A. 2.** Through the whole of (a space, region, etc.); in or to every part of; everywhere in. **B. 2.** Through the whole of a body, regions, etc. ; in or to every part, everywhere. [Vol. IX. Part II. SU-TH] A NEW ENGLISH DICTIONARY ON HISTORICAL PRINCIPLES 375 (1919) (more commonly known as the Oxford English Dictionary).

*See* Exhibit F.

Dictionaries define "substantially" as follows:

- **substantially.** *adv.* **1.** In the manner of a substance; with reality of existence. **2.** Strongly; solidly. **3.** In substance; in the main; essentially. WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY 1699 (unabridged ed. 1957).

- **substantially. 1.** . . . **b**. Essentially, intrinsically. **c**. Actually, really. . . . **4.** In all essential characters or features; in regard to everything materials, in essentials, to all intents and purposes; in the main. [Vol. IX. Part II. SU-TH] A NEW ENGLISH DICTIONARY ON HISTORICAL PRINCIPLES 56 (1919) (more commonly known as the Oxford English Dictionary).

*See* Exhibit G.

Because the phrase "substantially throughout its area" was introduced for the first time during prosecution, it does not appear in the specification as filed. The specification therefore does not provide any explanation for what the term "substantially" means in the claims.

In contrast to the specification, the prosecution history defines the phrase as used in the claims. As described above, the USPTO rejected the claims of the patent application (including

---

[4] *See also* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1870 (3d ed. 1992) (defining "throughout" as "[prep.] In, to, through, or during every part of; all through . . . . [adv.] In or through all parts; everywhere"; WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1395 (3d ed. 1997) (defining "throughout" as "[*prep.*] all the way through; in or during every part of . . . [*adv*] **1.** in or during every part; everywhere; from start to finish **2** in every respect.").

claim 11, then numbered claim 16) in an office action of June 30, 2005, in view of the Bassett patent. In response, Gear 2000 amended claim 16 to add the phrase "substantially throughout its area," as follows:

> 16. (currently amended) Football shoulder pads, comprising:
> . . . .
> said hard inner layer having spaced part openings therethrough to allow airflow through said torso pad member <u>substantially throughout its area</u>.

Ex. C, Amendment (10/19/05), p. 6.

This amendment was made in conjunction with the amendment to add the term "breathable" to "<u>breathable</u> torso pad member." In connection with these amendments, Gear 2000 made the arguments quoted at length above. While the entire argument is relevant to the claims construction, Gear 2000's recitation of its reason for the amendment has particular bearing on the meaning of the phrase "substantially throughout its area." Gear 2000 explained: "Now, as amended, the claims further emphasize the breathability of the pad as a whole. More specifically, claim 1 [and 16] has been amended to explicitly recite a **breathable** protective pad that allows air or moisture to flow **throughout** the pad's area." *Id.*, p. 10.

It is axiomatic that a claim should be construed as a whole. The "torso pad member" itself must be "breathable." For the torso pad to be breathable "as a whole," as emphasized by Gear 2000, there must be "airflow through" the torso pad "substantially throughout its area." This functional limitation results only from using "breathable foam," which permits circulation and movement of air through the padding material itself, and not just through perforations, holes, or cutouts in the padding, as Gear 2000 represented to the USPTO and the public.

If a perforated, non-breathable foam were used, there would be airflow only through those perforations that are in alignment with the larger holes in the central, rigid layer. No air

would flow through the non-breathable padding material itself. This is the structure that Bassett disclosed and that Gear 2000 explicitly distinguished and disclaimed during prosecution. Indeed, a torso pad with layers of perforated, non-breathable foam allows airflow only through a very small percentage the torso pad's area, and thus cannot meet the limitation of "allow[s] airflow through [the] torso pad substantially throughout its area."

Reading the claim as a whole, considering the plain language, specification, and prosecution history, the entire phrase "allow airflow through said torso pad substantially throughout its area" should be construed as follows: "Circulation of air or moisture, sufficient to effectively ventilate body heat or perspiration from the wearer, through one side of the torso pad, passing into one surface and out of the opposing surface of the padding material of the first and second foam layers, then passing out of the other side of the torso pad, which circulation occurs essentially everywhere in the torso pad."[5]

## V.    MEANS PLUS FUNCTION ELEMENTS IN CLAIMS 12, 13, 15, AND 16

The parties agree that Claims 12, 13, 15, and 16 each include elements set forth in means-plus-function format. The parties also agree that pursuant to 35 U.S.C. § 112, ¶ 6, these elements are to be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

As noted above, construction of a means-plus-function is a two-step analysis, requiring the court to identify particular "corresponding" structures from the specification. For a means-plus-function element in particular, an actual and complete construction by the court is a necessity, as the statute itself indicates that the element "shall be construed" to cover the

---

[5] However, the proposed interpretation cannot cure the basic indefiniteness as to the amount of airflow or breathability required to provide a meaningfully precise and objective standard for the scope of the claimed invention. *See Datamize*, 417 F.3d at 1347 ("[T]he purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude.") (citing *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1132, 1338 (Fed. Cir. 2003).

corresponding structure.  However, during the exchange of proposed constructions pursuant to the Court's Scheduling Order, Gear 2000, while acknowledging the need for construction, merely pointed to overly broad sections of the specification, rather than identifying the actual, corresponding structure.  Pointing to a section of the specification (particularly one that is four paragraphs long) falls short of identifying particular structure as required by the second step of means-plus-function analysis.  Failure to particularly identify the corresponding structure as required would leave to the jury the task of interpreting the claim term—a question of law.

### A.    "Means For Releasably Securing" in Claim 12

| Disputed Claim Language | Russell's Proposed Construction | Gear 2000's Proposed Construction |
|---|---|---|
| means for releasably securing | A strap and a loop, the strap attached at one end to the upper end of the cap pad, the loop secured to the shoulder portion of the torso pad, where a free end of the strap is adapted to extend through the loop and be secured to itself (the strap) by hook and loop tape. | Pursuant to 35 U.S.C. § 112 ¶ 6, any means plus function claim language shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.  Without limitation, "means for releasably securing" is discussed in the specification at col. 4, line 30 – col. 5, line 10. |

Beginning with the first step of means-plus-function analysis, the function described in claim 12 must be identified.  The full clause in claim 12 that contains this element reads, "means for releasably securing said cap pad at said shoulder portion."  Considering the plain meaning of this clause, the function of the element is to attach the cap pad to the shoulder of the torso pad in a way that the cap pad can also be detached.  This plain understanding of the function required is supported by the specification.  *See* Ex. A, '104 Pat., at column 5, lines 8-

10 ("By releasing the strap's hook and loop attachment, the cap pads 28 and 30 can be removed from the shoulder pads 10.").

Having identified the function, the corresponding structure in the specification is to be identified.  The discussion of structure corresponding to the function of the "means for releasably securing" in claim 12 of the '104 Patent begins at column 4, line 52 ("The upper cap portions 70 are releasably and adjustably secured to the shoulder portions …").  The structure here identified includes a strap having the structure described in detail at col. 4, lines 55-63, and a loop with the structure described at col. 4, line 64 to col. 5, line 3.  *Id.*  Russell's proposed construction identifies these structures:  "A strap and a loop, the strap attached at one end to the upper end of the cap pad, the loop secured to the shoulder portion of the torso pad, where a free end of the strap is adapted to extend through the loop and be secured to itself (the strap) by hook and loop tape."

Gear 2000 suggests looking to the language within columns 4, line 30 to column 5, line 10.  Russell agrees that corresponding structure is found within this area of the specification, but not all of the structures in the location cited by Gear 2000 are corresponding to the function identified.  For example, column 4, line 30 – 51 deal expressly with securing the cap pads to the wearer's arm—a different function altogether than releasably securing to the shoulder portion of the torso pad.  *Id.*  Russell's proposed construction correctly identifies the structure corresponding to the recited function.

### B.     "Means For Securing" in Claim 13

| Disputed Claim Language | Russell's Proposed Construction | Gear 2000's Proposed Construction |
|---|---|---|
| means for securing | A nylon covering that encloses two cap pads with a stitched area separating the two pads to form a | Pursuant to 35 U.S.C. § 112 ¶ 6, any means plus function claim language shall be construed to cover the corres- |

| | hinge, which covering has an elastic strap stitched to its outside edges adjacent the lower end of the lower cap pad in a position to extend across the width of the lower cap pad | ponding structure, material, or acts described in the specification and equiva- lents thereof. Without lim- itation, "means for secur- ing" is discussed in the specification at col. 4, line 30 – col. 5, line 10. |

Stepping through the two-step analysis for construction of this means-plus-function element, the function of the "means for securing" in claim 13 is to attach the cap pad to the wearer's arm in a manner that provides protection to the arm as the arm moves in any direction. This plain understanding of the function is supported by the specification at column 4, lines 49-50, directly addressing this subject: "Thus, the cap pads 28 and 30 can be secured to the athlete's upper arm to ensure the padding moves with the arm regardless of the direction of movement." Ex. A, '104 Pat. This language in the specification not only confirms the function recited in the claim, but also signals that the structure immediately preceding this sentence is what corresponds to the function in order to accomplish it. Accordingly, the corresponding structure to the "means for securing" in claim 13 is described in the specification at column 4, lines 38-49. *Id.* Russell's proposed construction recites the structure described in this location.[6] (Once again, Gear 2000's proposed construction again does not identify structure as required by 35 U.S.C. 112 ¶ 6, and therefore is not an acceptable construction.)

---

[6] Russell anticipates that Gear 2000 may assert that the corresponding structure is simply the "elastic wraps," notwithstanding the fact that Gear 2000 was not so specific in its initial proposal of the construction. Such a position, however, would fail to capture the full structure described for accomplishing the cited function. The function recited in the claim requires that the "means" (a) secures the <u>cap pad</u> to the wearer's arm; and (b) protect the arm with any movement. The specification describes that the elastic wrap is specifically stitched to the nylon covering as the structural arrangement connecting the pad to the strap. Ex. A, '104 Pat., 4:46. In the absence of the nylon covering, the specification would not describe any way to affix the elastic wrap to the pads. Moreover, the specification is careful to describe that the nylon covering is hinged, which is apparently important to the function of permitting the cap pad to move with the arm to protect it in any movement.

24

In accordance with the principles of construction, the "means for securing" must be construed as "A nylon covering that encloses two cap pads with a stitched area separating the two pads to form a hinge, which covering has an elastic strap stitched to its outside edges adjacent the lower end of the lower cap pad in a position to extend across the width of the lower cap pad".

### C.    "Means For Accessorizing" in Claim 15

| Disputed Claim Language | Russell's Proposed Construction | Gear 2000's Proposed Construction |
|---|---|---|
| means for accessorizing | A screw extending through the outer arch and secured to the outer arch by a t-nut which extends into the outer arch from the inner surface of the outer arch | Pursuant to 35 U.S.C. § 112 ¶ 6, any means plus function claim language shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. Without limitation, "means for accessorizing" is discussed in the specification at col. 3, line 66 – col. 4, line 27. |

Although the term "means for accessorizing" appears in both claim 15 and claim 16, it does not have the same meaning in each claim. Applying the proper two-step, means-plus-function analysis renders the proper construction. In claim 15, the function is identified as accessorizing the outer arch of the football shoulder pads. Specifically, claim 15 requires that the "means for accessorizing" be secured to the outer arch for the function of securing accessories thereto.

As to corresponding structure, the specification describes two types of structures for accessorizing the shoulder pads, labeled "accessory attachments 60" and "accessory attachments 61," respectively. However, only one of those types of structures performs the function of

accessorizing the outer arches.  Beginning at column 3, line 64 through column 4, line 2 the specification explains that it is accessory attachments 60 that are attached to the outer arch.  Ex. A, '104 Pat.  The structure of these outer arch attachment means are set forth at column 4, line 8-11: "As seen in FIG. 10, each accessory attachment 60 includes a screw 62 extending through the outer arch 32 and secured thereto by t-nut 64, which extends into the outer arch 32 from its inner surface.  *Id*.  Thus, the corresponding structure in the specification for "means for accessorizing" that are to be secured to the outer arch in claim 15 is "A screw extending through the outer arch and secured to the outer arch by a t-nut which extends into the outer arch from the inner surface of the outer arch," as proposed by Russell.

### D.    "Means For Accessorizing" in Claim 16

| Disputed Claim Language | Russell's Proposed Construction | Gear 2000's Proposed Construction |
|---|---|---|
| means for accessorizing | Extruded vinyl or plastic flaps positioned adjacent the lower edge of each torso half with slots and/or holes through the flaps for receiving attachments hooked therein, which flaps are riveted across their length adjacent the flap's top edge, with the rivets extending through the outer foam layer to the inner plastic layer | Pursuant to 35 U.S.C. § 112 ¶ 6, any means plus function claim language shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.  Without limitation, "means for accessorizing" is discussed in the specification at col. 3, line 66 – col. 4, line 27. |

The "means for accessorizing" in claim 16 has a different function and corresponds to different structures in the specification than in claim 15.[7]  Specifically, the function in claim 16 is to accessorize the torso pad member itself, rather than the outer arch.  The corresponding

---

[7] Notably, accessory attachments 60 cannot correspond to means for accessorizing the torso pad in claim 16, because the specification teaches *against* such use.  Ex. A, '104 Pat. at 4:12-19.

structure for accomplishing this function is described in the specification as accessory attachments 61, at column 4, lines 20-24. *Id.* That location identifies the structure proposed by Russell in its construction. Accordingly, "means for accessorizing" in claim 16 should be construed as follows: "extruded vinyl or plastic flaps positioned adjacent the lower edge of each torso half with slots and/or holes through the flaps for receiving attachments hooked therein, which flaps are riveted across their length adjacent the flap's top edge, with the rivets extending through the outer foam layer to the inner plastic layer."

## VI. CONCLUSION

Russell's proposed constructions of the claim terms at issue in this case fully take into account the language of claims, the specification, and the prosecution history. Gear 2000 should be held accountable for the representations it made to the USPTO and the public during the prosecution of the '104 Patent. Russell respectfully requests the Court to adopt its proposed constructions of the disputed claim terms set forth above.

Respectfully submitted,

*/s/  Russell S. Jones, Jr.*
Russell S. Jones, Jr. D. Kan. #70814
Richard P. Stitt KS #14268
Joshua M. McCaig MO #56059
POLSINELLI SHUGHART, P.C.
120 West 12th Street, Suite 1600
Kansas City MO 64105
Telephone: 816-421-3355
Facsimile: 816-374-0509
rjones@polsinelli.com
rstitt@polsinelli.com
jmccaig@polsinelli.com

27

OF COUNSEL
Paul M. Sykes
Nathan W. Johnson
Edward J. Everitt
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Fax: (205) 521-8800
psykes@babc..com
njohnson@babc.com
eeveritt@babc.com

ATTORNEYS FOR DEFENDANT
RUSSELL CORPORATION

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Ginnie C. Derusseau
James J. Kernell
Erickson, Kernell, Derusseau & Kleypas, LLC
4400 College Boulevard, Suite 130
Overland Park, KS 66211
Phone: (913) 339-9666
Fax:     (913) 339-6061
ginnied@usapatlaw.com

John P. Passarelli, NE #16018
Stephen J. Pedersen, NE #22465
Kutak Rock LLP
1650 Farnam Street
Omaha, NE 68102
Telephone:  (402) 346-6000
Facsimile:  (402) 346-1148
john.passarelli@kutakrock.com
stephen.pedersen@kutakrock.com

*Attorneys for Plaintiff Ed Tobergte Associates*
*Company d/b/a Gear 2000*

*/s/ Russell S. Jones, Jr.*
Attorney for Defendant Russell Corporation

1/1905611.3