**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| ED TOBERGTE ASSOCIATES COMPANY d/b/a GEAR 2000, an Ohio corporation,<br><br>    Plaintiff,<br><br>v.<br><br>RUSSELL CORPORATION, a Delaware corporation, n/k/a RUSSELL BRANDS, LLC, a Delaware Limited Liability Company<br><br>    Defendant. | Case No.   2:08-cv-02290-JWL-GLR |

### RUSSELL BRANDS LLC'S RESPONSIVE CLAIMS CONSTRUCTION BRIEF

Pursuant to paragraph 4(f)(3) of the Court's Scheduling Order (Doc. 27), Defendant Russell Brands LLC ("Russell") submits this response to Plaintiff's Claims Construction Brief.

**I.   INTRODUCTION**

In its Claims Construction Brief (Doc. 59), Plaintiff Ed Tobergte Associates Co. d/b/a Gear 2000 ("Gear 2000") presents various criticisms of Russell's claims constructions that are largely a confusing exercise in semantics. For example, Gear 2000 levels sharp criticisms against Russell's use of various terms, when Russell used those terms the same way that Gear 2000 did during prosecution of the patent application. These include the use of the terms "pad" versus "torso pad member," as well as the use of "closed cell foam" versus "conventional closed cell foam." That Gear 2000 makes such arguments is not a surprise because Gear 2000 would prefer to ignore the prosecution history entirely. Once one cuts through the semantics, these issues are easily resolved.

More importantly, Gear 2000 begins its Claims Construction Brief with the remarkable "assertion that no construction of the claims of the patent in suit ('Claims') is necessary."

1

2554937.01

Plaintiff's Claims Construction Br., (Doc. 59), p. 1.  To make this bold assertion, Gear 2000 contends that the prosecution history should be ignored.  *Id.*, p. 8.  Apart from being contrary to the established law, *see Graham v. John Deere Co. of Kansas City v. Cook Chemical Co.,* 383 U.S. 1, 33 (1966) ("It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office."), this assertion is quite telling.  Gear 2000 wants no construction of certain key terms, such as "breathable foam," because even the most basic literal definition of that term results in a claim scope that undermines Gear 2000's case.  Other key claim terms that are functional in nature, such as "allow airflow through the torso pad member," evade any objective boundaries and meaningfully precise claim scope, once one tries to define them.  From Gear 2000's perspective, no claim construction is far better than any claim construction at all.  The absence of any claim construction leaves Gear 2000 free to argue to the jury that the claims mean what Gear 2000 says they mean.  While that may serve Gear 2000's interests, it usurps this Court's role in construing the claims and puts that difficult legal task in the hands of the jury, directly contrary to the Federal Circuit's recent decision in *O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360, 1361 (Fed. Cir. 2008) (reversing district court that declined to construe disputed term "only if" and stating "[w]hen the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute"); *see also Autogiro Co. of America v. United States*, 384, F.2d 391, 397 (Cl. Ct., 1967) ("Thus we find that a claim cannot be interpreted without going beyond the claim itself. No matter how clear a claim appears to be, lurking in the background are documents that may completely disrupt initial views on its meaning.  The necessity for a sensible and systematic approach to claim interpretation is axiomatic. The Alice-in-Wonderland view that something means whatever one chooses it to

mean makes for enjoyable reading, but bad law. . . In seeking this goal, we make use of three parts of the patent: the specification, the drawings, and the file wrapper." ).

Gear 2000 essentially argues that because the claims at issue use simple, everyday words, there is no need to construe them. There is, however, a significant difference between determining the *meaning* of words used in a claim and the legal *scope* of claims containing those words. Confusing these two concepts was the basis of the legal error in *O2 Micro*. *See id.* at 1361 ("In deciding that ' "only if" needs no construction' because the term has a 'well-understood definition,' the district court failed to resolve the parties' dispute because the parties disputed not the *meaning* of the words themselves, but the *scope* that should be encompassed by this claim language."). While the '104 Patent claims use simple words, construing those claims to determine their proper legal scope is a necessary legal task critical to the outcome of this case.

## II.   CLAIM TERMS/PHRASES – CLAIM 11

### A.   Breathable Torso Pad Member

As Russell explained in its initial Claims Construction Brief, the plain meaning, specification, and prosecution history of the '104 Patent support the definition that a "breathable torso pad member" is one that "allows air or moisture to flow through the pad throughout its whole area." Gear 2000, however, takes issue with Russell's use of the term "the pad" in this definition. Gear 2000 contends that the term "the pad" includes all parts of the shoulder pad, *i.e.*, the deltoid pads, the shoulder cap pads, and the exterior plastic arches, as well as the torso pads, and that Russell's use of the term creates an illogical, internally inconsistent, and irreconcilable claims construction. Doc. 59, pp. 12-13.

In fact, Russell's proposed definition tracks very closely the statements made by Gear 2000 during prosecution of the patent to explain its claim amendment to limit the element "torso pad member" to a "breathable torso pad member." *See* Ex. C to Russell Claims Construction Br.

3

(Doc. 58), Amendment (10/19/2005), p. 10 ("Now, as amended, the claims further emphasize the breathability of *the pad* as a whole. More specifically, claim 1 [and 16] has been amended to explicitly recite a **breathable** protective pad that allows air or moisture to flow **throughout** *the pad's* area." (italicized emphasis added).  Russell thus used the term "the pad" in the definition of "breathable torso pad member" the same way Gear 2000 did during prosecution. In doing so, Russell was not contending that the term referred to portions of the shoulder pad other than the torso pad member.

To clarify this point, Russell amends its proposed claims construction as follows: "breathable torso pad member" means "a torso pad member that allows air or moisture to flow through the torso pad member throughout its whole area."

Likewise, Gear 2000 criticizes Russell's inclusion of the phrase "throughout its whole area" in the definition of "breathable" torso pad.  Gear 2000 asserts that Russell provides "no basis, argument, or explanation in support of [this] proposal." Plaintiff's Reply Brief (Doc. 62), p. 2.  In fact, Russell's proposal requiring the "breathable" torso pad to allow airflow "throughout its whole area" is taken nearly verbatim from the prosecution history related to this very issue.  As noted above, in conjunction with the amendment inserting the word "breathable" before "torso pad," Gear 2000 emphasized that its pad is breathable "as a whole" and allows airflow "throughout the pad's area."  Although Gear 2000 would like to disregard its statements made during prosecution history, the public and its competitors are entitled to rely upon them and the claims should be limited accordingly.

    **B.**    **Breathable Foam**

        **1.**    **Gear 2000 Unambiguously Disclaimed a Conventional Closed Cell Type Foam Material from the Definition of Breathable Foam.**

Russell's proposed definition of "breathable foam," based upon the plain language, specification, and prosecution history, is "a padding material that allows the flow of air or

moisture through the padding itself and not merely through a hole or cutout in the padding. Breathable foam does not include a closed cell type foam." Among other arguments, Gear 2000 stridently takes issue with the exclusion of "closed cell type foam" from the definition of "breathable foam." Gear 2000 argues that such a definition would exclude "both preferred embodiments shown in the patent." Plaintiff's Reply Brief (Doc. 62), p. 1. That is not the case. Gear 2000's position depends upon conflating two types of foam that are clearly distinguished in the specification, and which Russell correctly identified and distinguished in its Brief. Once again, Gear 2000 also ignores its own statements from the prosecution history.

As with the "pad" versus "torso pad" issue above, Gear 2000 criticizes Russell for using a phrase just as Gear 2000 did in prosecution. Specifically, both Gear 2000 during prosecution history, and Russell in its brief, referred to conventional closed cell foams simply as "closed cell foam" or a "closed cell type foam." In arguing to the USPTO that the foam used in the Bassett pad is nonbreathable, Gear 2000 stated: "Basset discloses a **nonbreathable** pad having layers of **nonbreathable** materials. *Padding layers 38 and 42* are disclosed as being *closed cell type foam*, such as VNS, which does not allow air and moisture transfer. . . ."[1] Ex. C to Doc. 58, Amendment (10/19/2005), p. 1 (italicized emphasis added). The statement is crystal clear. Gear 2000, in its own words, says that a "closed cell type foam" is a "nonbreathable material." In the specification Gear 2000 actually identified "closed cell foams*"* as an example of "padding materials" that "do not allow body heat to be released and thus, are very warm when worn by an

---

[1] Gear 2000 criticizes Russell for omitting from its brief the Examiner's remarks about the outer fabric layer 34 and Gear 2000's reply about this outer layer. Gear 2000 Resp. Br. (Doc. 62, p. 7-8). However, the outer fabric layer is not an element of claim 14, or any claim at issue in this litigation. What is relevant are the foam padding layers 38 and 42 of Bassett, cited by the Examiner as corresponding to the "breathable foam layers" of claim 14. The Bassett foam layers are constructed of a perforated closed cell foam, and Gear 2000 clearly disclaimed this material from the scope of the term "breathable foam" in its arguments to the USPTO. The outer fabric layer 34 is simply not relevant.

5

2554937.01

athlete," *i.e.*, nonbreathable. '104 Patent, 1:28, 32-34 (emphasis added). Even in the present *Markman* briefing, Gear 2000 identifies "closed cell foam" as "non-porous." Plaintiff's Claim Construction Brief (Doc. 59), p. 17 ("Defendant's proposed construction of 'essentially everywhere' cannot be reconciled with a closed cell foam with holes punctured therethrough because a significant portion of the surface area of the closed cell foam remains non-porous.").

Consistent with the specification and prosecution history, Russell in its Claims Construction Brief identified conventional closed cell foam as "closed cell foam." Russell explicitly contrasted this closed cell foam with another type of foam material described in the '104 Patent called "Brock" foam, and Russell identified Brock foam as a breathable foam. Russell Claims Construction Br. (Doc. 58), p.12. Brock foam is "formed of closed cell foam beads fused together where the individual beads meet." '104 Pat., 3:35-37. It is not a conventional closed cell foam; the material is sufficiently novel and distinguishable from conventional closed cell foams that it was awarded two U.S. patents (U.S. Pat. Nos. 5,920,915 and 6,032,300), as noted by Gear 2000 in the '104 Patent. *See id.* at 3:38-39.

To avoid the clear implications of its prosecution history, Gear 2000 must conflate Brock foam, which is described as breathable in the specification, '104 Pat. 3:35-43, with conventional closed cell foam, which is described as nonbreathable in the specification and file history. Gear 2000 then argues that conventional closed cell foams cannot be excluded from the definition of "breathable foam" without excluding Brock foam. That argument is without merit.

Any confusion between these two types of foam can be eliminated by amending the second sentence of Russell's proposed definition of breathable foam to state, "Breathable foam does not include closed cell type foams other than a foam formed of closed cell foam beads fused together where the individual beads meet."

6

### 2. Russell's Construction of "Breathable Foam" Does Not Render Any Claim Superfluous

Gear 2000 also argues that Russell's proposed definition of "breathable foam," which excludes conventional closed cell foams, would render claims 7, 17, and 22 superfluous.[2] The argument goes like this: claims 17 and 22 depend from claim 11, the sole independent claim at issue. Claim 11 claims "layers of breathable foam," and claims 17 and 22 claim "layers of breathable foam . . . . formed of closed cell foam beads fused together." Gear 2000 argues that if conventional closed cell foams are excluded from the definition of "breathable foam" in claim 11, then the only "breathable foam" within the scope of claim 11 is a foam "formed of closed cell foam beads fused together." But the latter is explicitly claimed in claims 17 and 22, which Gear 2000 argues would make these claims superfluous in view of claim 11, if Russell's definition were adopted.

Gear 2000's argument depends on the assumption that exclusion of conventional closed cell foams leaves only one candidate—closed cell foam beads fused together (Brock foam)—for the term "breathable foam." That assumption is false. Gear 2000 itself states in its brief that breathable foam can be open cell foam (without perforations). Plaintiff's Claim Construction Brief (Doc. 59), p. 2 ("The breathable foam can be, *among other things*, 'open' cell foam or 'closed' cell foam, the latter containing perforations, each allowing air to flow through." (emphasis added)). Thus, excluding conventional closed cell foams from the definition of "breathable foam," the term as used in claim 11 still includes *at least* closed cell foam beads fused together (Brock foam) and open cell foam. Claims 17 and 22 claim only Brock foam. Under Russell's definition of "breathable foam," claim 11 is broader than claims 17 and 22, and they are not rendered superfluous.

---

[2] Claim 7 depends from Claim 1, neither of which is at issue in the case. The same arguments set forth above apply as these claims as well.

7

As emphasized by the italicized language in the preceding paragraph, the parties agree that there may be other foam materials that are breathable in addition to the open cell foam and Brock foam identified in the specification. Russell's definition therefore does not read limitations of the specification into the claim, or limit the claim to only those embodiments explicitly disclosed in the specification, as argued by Gear 2000. Rather, Russell's construction holds Gear 2000 accountable for its representations to the USPTO and the public during prosecution of the '104 Patent by excluding the one type of material—conventional closed cell type foams—that Gear 2000 clearly disclaimed as nonbreathable.

### 3. The Plain Meaning of the Term "Breathable Foam" Excludes Conventional Closed Cell Foam, which is a Nonbreathable Material.

Claim 11 explicitly claims a layer of "breathable foam." The use of a "breathable foam" therefore is dictated by the plain language of the claim. Even Gear 2000 concedes that a conventional closed cell foam is not breathable. Gear 2000 said so in the specification ('104 Patent, 1:28, 32-34), the prosecution history, and most recently in its Claims Construction Brief (Doc. 59, p. 17 ("non-porous")). Thus, a conventional closed cell foam cannot literally be within the scope of the term "breathable foam."

The only way that air can flow through a layer of conventional closed cell foam is to punch holes in it. This causes air to flow through the punched holes **only**, not through any open region or space in the foam itself. Thus, one could possibly have a "*breathable layer* of foam" using perforated closed cell foam, but as Russell explained at length in its Claims Construction Brief, Gear 2000 distinguished the Bassett reference on this very basis. *See* Doc. 58, pp. 12-15 and Ex. C thereto, Amendment (10/19/2005), p. 11 ("Nothing suggests that the cutouts [in Bassett] would make the **padding** breathable. Put another way, the **cutout** will allow ventilation through the cutout **only**, but the padding still would not provide any air or moisture transfer." (emphasis in original)). Gear 2000 therefore disclaimed from the scope of its claims a breathable

8

2554937.01

layer made from conventional closed cell foam with holes in it, where the air flows through the holes and not through the closed cell foam itself. *See Rheox Inc. v. Entact Inc*., 276 F.3d 1319, 1325 (Fed. Cir., 2002) ("Arguments and amendments made during prosecution of a patent application must be examined to determine the meaning of terms in the claims. . . The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." (*citing Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995))).

To adopt Gear 2000's construction, not only must one ignore the prosecution history, but also the literal, grammatical, and structural distinctions between the phrases "a breathable *layer* of foam" and a "layer of *breathable foam*." These distinctions are important. "The patentee is presumed to have intended every word chosen for use in a claim to have a specific function in adding to the meaning to the claim." Plaintiff's Claim Construction Brief (Doc. 59), p. 4 (citing *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149 (Fed. Cir. 1997)). Plantiff similarly recites: " '[I]t is well settled that no matter how great the temptation of fairness or policy making, courts do no redraft claims.' " *Id.* (quoting *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed. Cir. 1995)). While Gear 2000 gives lip service to these rules, Gear 2000 abandons them entirely when faced with their application to the obvious distinction between "a breathable layer of foam" and the actual claim language "a layer of breathable foam." Instead, Gear 2000 can only say without explanation or authority that "this is a distinction without a difference." Plaintiff's Reply Br. (Doc. 62), p. 4, 12. To the contrary, the distinction is everything and creates substantial differences in claim scope. It is a "well settled practice" that courts "construed the claim as written, not as the patentees wish they had written it." *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1347 (Fed. Cir. 2004); *see also id.* at 1375 (refusing to construe literal claim language "heating to" a certain temperature to mean heating "at" such temperature

9

as intended by patentee, even where the "heating to" limitation would result in a completely inoperable invention).

### C. Allow Airflow Through the Torso Pad Member

The words "allow airflow through" are part of the larger phrase "allow airflow through said torso pad member substantially throughout its area." As actual claim language, these words must be given effect, and their meaning is clearly functional, not structural. But when faced with the implications of this functional language, Gear 2000 argues that these words should be ignored, stating that "the claim cannot be limited by reference to functional language." Plaintiff Reply Br. (Doc. 62), p. 14 (citing *Schwing GmBH v. Putzmeister Aktiengesellchaft*, 305 F.3d 1318 (Fed. Cir. 2002)).

The *Schwing* case, however, does not support Plaintiff's assertion that an express claim limitation be ignored. The claim at issue there was written in "*purely* structural terms." *Schwing*, 305 F.3d at 1324. ("Claim 1 defines the 'annular extensions' [the term at issue] in purely structural terms." (citing *Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371, (Fed. Cir. 2001) ("An invention claimed in purely structural terms generally resists functional limitation.")). Unlike the present case, the claim in *Schwing* did not contain any functional language. *See id.* ("We find *nothing* in the claim language itself that requires the annular extensions to perform the function of inhibiting radial expansion of the sealing ring." (emphasis added)).[3]

Here, the claim language itself requires that various structures must perform the function of "allow[ing] airflow through the torso pad member substantially throughout its area." This

---

[3] Likewise, the *Schwing* applicant's remarks to the USPTO during prosecution were expressed in "purely structural terms." *Schwing*, 305 F.3d at 1325. In comparison, Gear 2000's remarks during prosecution were couched almost exclusively terms of breathability and air and moisture transfer across the pad as a whole, all functional terminology.

10

functional language must be given effect, and it clearly imposes limitations on the structures claimed. Further, "[s]ome objective standard must be provided in order to allow the public to determine the scope of the claimed invention." *Datamize, LLC v. PlumTree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005).

Gear 2000 argues for a plain language definition of "allow airflow" and states that the phrase is "passive". If "allow airflow" is passive, then airflow can be "allowed" only in response to some external force, which is nowhere to be found in the claim. How small or large must this force be to allow sufficient airflow through the torso pad member to meet the claim limitation? Setting aside the question of what causes the airflow, what degree of airflow is sufficient to meet the claim limitation? Is any miniscule amount of airflow enough? How are we to measure it? If one applied a high pressure air stream to one side of a torso pad and only a small bit of air leaked through, surely one would not consider that to be a "breathable torso pad" even though it "allows airflow" in response to high air pressure.

As opposed to a "passive" construction, Russell proposed in its definition that the torso pad ventilate the wearer, in keeping with the object of the invention to provide a shoulder pad that is cooler to wear. But Gear 2000 objected to this definition as requiring "active wicking" of air and moisture, Doc. 62, p. 14, which Gear 2000 says demands too much and imposes a "seemingly immeasurable standard" on the claim Doc. 59, p. 16. Where is the line to be drawn? The same problem extends to the functional term "breathable." The '104 Patent leaves unanswered the question of how "breathable" a foam must be—how much airflow it must allow in response to some unknown external condition—to be within the claim scope.

"Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008). In

11

*Halliburton*, the Federal Circuit struck down a claim as indefinite because the term "fragile gel" was not susceptible to a meaningfully precise claim scope. The court did so despite the fact that the specification included a lengthy definition of what the patentee meant by the term "fragile gel," *Halliburton*, 514 F.3d at 1246-47, and even included a chart showing data purporting to define the bounds of the term, *id.* at 1248 (Fig. 3). Even with its proposed definition and data, however, the patent did not adequately define how "fragile" a gel must be, to be a "fragile gel." *Id.* at 1248. The patentee also proposed defining the term by a test that would determine if a gel was fragile according to whether it displayed a certain capability (suspending drill cuttings). The Federal Circuit rejected this approach, stating that such a definition "fares no better because nothing in the record suggests what degree of such capability is sufficient." *Id.* at 1254; *see also id.* ("[A] testing protocol [identified by the patentee] still does not answer the fundamental question: what quantity, weight, size and/or volume of cuttings must be suspended [for a gel to be a fragile gel]? Halliburton does not attempt to resolve this ambiguity, instead arguing that this limitation merely means adequate for the circumstances."). "By failing to identify the degree of the fragility of its invention, Halliburton's proposed definition would allow the claims to cover not only that which it invented that was superior to the prior art, but also all future improvements to the gel's fragility. While patentees are allowed to claim their inventions broadly, they must do so in a way that distinctly identifies the boundaries of their claims." *Id.* at 1253. The degree of improvement over the prior art was ambiguous, and as a result, "it is unclear whether a person of ordinary skill in the art would have interpreted this claim as having an upper bound of fragility." *Id.*

The ambiguity in the '104 Patent exceeds by far that which led the Federal Circuit to find the patent claims indefinite in *Halliburton*. Unlike the *Halliburton* patent, the '104 Patent does not even attempt to provide a definition of "breathable" foam or to explain what is meant by

12

"allows airflow" through the torso pad. Unlike *Halliburton*, the '104 Patent fails to provide any objective, empirical data or quantitative framework on these key issues. Like *Halliburton*, the claims and the specification here do not identify the degree of breathability of the torso pad, or the degree of airflow through the pad that is supposed to be achieved by the invention. Like *Halliburton*, there is no upper boundary for breathability or airflow in the specification or the claims. Finally, like *Halliburton*, Gear 2000's proposal not to define these terms "would allow the claims to cover not only that which it invented that was superior to the prior art, but also all future improvements to the [torso pad's breathability]." *See id.* at 1253.

In sum, Gear 2000 requests that no definition be provided for the phrase "allows airflow through the torso pad member," and that this explicit, functional claim language imposes no limitation on the invention. And for good reason: the absence of a definition leaves Gear 2000 with an open-ended, unbounded claim scope for a functional term that is not subject to any objective, measurable standard. That may be good for Gear 2000, but "the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, *i.e.,* what subject matter is covered by the exclusive rights of the patent. Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." *Halliburton*, 514 F.3d at 1249. Although Russell in its initial brief proposed a definition of "allows airflow through the torso pad member," Russell respectfully submits that no objective boundaries, upper or lower, exist for this phrase. While *O2 Micro* mandates that a disputed claim term must be construed and Russell in its initial brief proposed a construction for this phrase, Russell respectfully submits that the phrase cannot be translated into a "meaningfully precise claim scope," thus rendering claim 11 indefinite.

13

D.   **Substantially Throughout [the Torso Pad's] Area**

Claim 11 requires that the airflow discussed above be allowed through the torso pad "substantially throughout its area." Gear 2000 again requests that this phrase not be defined—despite the fact that Gear 2000 itself added this claim limitation by amendment during prosecution to overcome the rejection by the USPTO in view of the Bassett reference. The phrase therefore must be construed to limit the claim in a way that differentiates the claimed invention from Bassett.

Prior to the amendment, claim 11 required only that the holes in the central rigid layer "allow airflow through the torso pad." There was no limitation as to *the extent* of airflow through the torso pad. Faced with the Bassett rejection, Gear 2000 argued that Bassett allowed airflow only through cutouts or holes in the pad and not through the padding itself, which was nonbreathable. Gear 2000 "emphasized"—both in argument and in amending the claim itself—that in contrast to Bassett, its claimed invention was breathable "as a whole" and "allows air or moisture to flow **throughout** the pad's area." Doc. 58, Ex. C, Amendment (10/19/05), p. 10. Thus, the particular point on which Gear 2000 distinguished Bassett was that the latter allowed airflow only through holes in the foam layer aligned with the holes in the rigid layer, rather than the pad as a whole throughout its area. Clearly, therefore, the claim limitation "substantially throughout its area" requires that the torso pad allow airflow over a greater area than just that area directly over the holes in the central rigid layer.

Because the phrase "substantially throughout its area" does not appear in the specification, Russell in its initial brief turned to dictionary definitions, in addition to the prosecution history, for a literal construction of the phrase. Dictionaries define the words "substantially throughout" to mean "essentially everywhere," and that definition is entirely

14

consistent with Gear 2000's assertion to the USPTO and the public that the pad is breathable "as a whole."

Gear 2000, however, complains that such a construction would eliminate conventional closed cell foam from the scope of the claim, because such "non-porous" foam allows airflow only through perforations, and only where those perforations line up with the holes in the central rigid layer. But that is exactly what Gear 2000 said was inferior about Bassett. Hence, by adding the limitation "substantially throughout its area," Gear 2000 did in fact amend the claim to exclude perforated conventional closed cell foam.[4]

The exclusion of a single embodiment does not justify rewriting claims, which is what would be required to interpret "substantially throughout" to mean "only in those specific areas where perforations in closed cell foam line up with holes in the central rigid layers." In fact, even if a claim amendment renders the entire invention inoperable—effectively excluding all embodiments—unambiguous claim language should be interpreted as written. *See Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

In *Chef America*, the patent involved a method for preparing certain dough products involving a step of heating the dough in an oven. *Id.* at 1374. The heating step in the claim initially did not include a temperature limitation. *Id.* In response to a rejection by the examiner, the patentee amended the heating step "to add the limitation of 'heating the resulting batter-coated dough to *a temperature in the range of about 400° F. to 850° F. . . .*' " *Id.* (emphasis in original). "The problem is that if the batter-coated dough is heated to a temperature range of 400° F. to 850° F., as the claim instructs, it would be burned to a crisp." What the patentee intended was that the oven (not the dough) should be heated to the specified temperature. The

---

[4] This disclaimer by amendment is independent of the fact that conventional closed cell foam is not a "breathable foam," as literally required by the claim.

patentee therefore argued that the claim should be interpreted so that the dough is heated "at" that temperature, not "to" that temperature, so the invention would be operable. *Id.* The Federal Circuit disagreed: "This court, however, repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity. Even 'a nonsensical result does not require the court to redraft the claims . . . .' " *Id.* (collecting cases). The court thus rejected the patentee's "basic contention that unless we rewrite the claim, the patented process cannot perform its intended function." *Id.* at 1375. The patentee was bound by its claim language, even though it defined a process that resulted in "something that . . . resembles a charcoal briquette," "[i]nstead of the dough products suitable for freezing and finish cooking to a light, flaky, crispy texture, which the patented process is intended to provide." *Id.* at 1373 (internal citations and quotations omitted).

In this case, even though Gear 2000's claim amendments exclude perforated conventional closed cell foam from the claim, they leave Gear 2000 with far more than a charcoal briquette. Using a Brock foam or open cell foam as described by the specification, air may flow from the small areas directly over the holes in the central rigid layer to adjacent areas to allow breathability of the torso pad "as a whole"—that is, "essentially everywhere" over the area of the pad. Adopting the definition "essentially everywhere" for the phrase "substantially throughout" is therefore consistent with the prosecution history, dictionary definitions, and includes two of the three embodiments disclosed in the specification.

### III.   MEANS PLUS FUNCTION CLAIM ELEMENTS

#### A.   Claim 12 – Means for Releasably Securing

Claim 12 includes the element "means for releasably securing said cap pad at said shoulder portion." Russell proposed the following definition for "means for releasably securing" (the language in bold being that part of the definition objected to by Gear 2000): "A strap and a

16

loop, the strap attached at one end **to the upper end** of the cap pad, the loop secured to the shoulder portion of the torso pad, where a free end of the strap is adapted to extend through the loop and be secured to itself (the strap) by hook and loop tape." Gear 2000 contends that the strap should be attached "at one end of the cap pad," and thus is not limited to the upper end of the cap pad.

Gear 2000 argues that Russell has improperly imported "the upper end" limitation from the specification into its proposed definition. However, Section 112 of the Patent Act, which provides the statutory authority for means plus function elements, mandates that such elements be construed by "the corresponding structure, material, or acts *described in the specification* and equivalents thereof." 35 U.S.C. § 112 (emphasis added). A court construing a means plus function element therefore first identifies the function performed and then looks to the specification to identify the corresponding structure in the written description of the patent that performs that function. *Omega Engineering, Inc. v. Raytek Corporation*, 334 F.3d 1314, 1321 (Fed. Cir. 2003). In other words, with a means plus function element, the corresponding structures identified in the specification are required to be imported into the claim.

With respect to the "means for releasably securing" the cap pad to the shoulder portion of the torso pad, the specification describes the corresponding structure as follows:

> The upper cap portions 70 are releasably and adjustably secured to the shoulder portions 22 of the football pads 10 and help protect the athlete's shoulders. As seen in FIGS. 3-5, an upper strap 74 extends outwardly from the center **of the top edge** of each upper cap portion 70. Thus, the upper strap 74 has one secured end 75 stitched to the upper cap portion 70 and another free end 76.

'104 Pat., 4:52-58. Figures 3-5 likewise show the strap 74 attached to the top edge of the cap pad 70. Accordingly, Russell's definition appropriately incorporates the corresponding structure from the specification, including that the strap is secured to the top end of the cap pad.

17

B.     Claim 13 – Means for Securing

Claim 13 provides for a "means for securing said cap pad to a wearer's arm." Russell proposed the following definition (with that portion objected to by Gear 2000 in bold): "**A nylon covering that encloses two cap pads with a stitched area separating the two pads to form a hinge, which covering** has an elastic strap stitched to its outside edges adjacent the lower end of the lower cap pad in a position to extend across the width of the lower cap pad." Gear 2000 contends the definition should not include the nylon covering structure and should only require the strap to extend from one side to the other side of the cap pad.

The specification, however, describes only one way that the elastic strap is secured to the cap pad, and that is by the nylon covering. '104 Pat. 4:45-51. Without the nylon covering, the strap is not secured to the cap pad and thus cannot perform the function of "securing [the] cap pad to a wearer's arm." The nylon covering should therefore be part of the definition of "means for securing."

C.     Claim 16 – Means for Accessorizing

Claim 16 includes a "means for accessorizing the football shoulder pads secured to said torso pad member." Both parties agree that this "means for accessorizing" should include the extruded vinyl or plastic flaps described in the specification. *See* '104 Pat. 4:20-27.

Gear 2000 contends that the "means for accessorizing" in claim 16 should also include "[a] screw extending through the outer arch and **secured to the outer arch** by a t-nut which extends into the outer arch from the inner surface of the outer arch." Doc. 62, pp. 18-19. (emphasis added). The outer arch is a hard plastic structure that is distinct from the torso pad member. '104 Pat. 3:66 and Figs. 1-2 (describing and showing arches 32 and torso halves 14 and 16 as separate structures with "small clearance" between them). As Gear 2000's definition states, the t-nut structure is "secured to the outer arch"—not to "the torso pad member" as

18

required by the plain language of claim 16. The means for accessorizing in claim 16 thus does not include the t-nut structure. This construction is also supported by reference to claim 15. Claim 15 explicitly claims "a means for accessorizing the football shoulder pads *secured to the outer arch*," and the parties agree that that "means for accessorizing" is the t-nut structure.

### IV.  CONCLUSION

Although Gear 2000 would prefer no claims construction, the law requires that the disputed terms and phrases be construed and to be translated into a meaningfully precise claim scope. The claims construction must also taken into account Gear 2000's disclaimers of claim scope during prosecution. For the foregoing reasons, Russell respectfully requests the Court to adopt Russell's proposed claims construction.

 /s/ Russell S. Jones, Jr.
Russell S. Jones, Jr. D. Kan. #70814
Richard P. Stitt KS #14268
Joshua M. McCaig MO #56059
POLSINELLI SHUGHART PC
120 West 12th Street, Suite 1700
Kansas City MO 64105
Telephone: 816-421-3355
Facsimile: 816-374-0509
rjones@polsinelli.com
rstitt@polsinelli.com
jmccaig@polsinelli.com

2554937.01

        OF COUNSEL
Paul M. Sykes
Nathan W. Johnson
Edward J. Everitt
Bradley Arant Boult Cummings LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Fax: (205) 521-8800
psykes@babc.com
njohnson@babc.com
eeveritt@babc.com

ATTORNEYS FOR DEFENDANT
RUSSELL CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Ginnie C. Derusseau
James J. Kernell
Erickson, Kernell, Derusseau & Kleypas, LLC
4400 College Boulevard, Suite 130
Overland Park, KS 66211
ginnied@usapatlaw.com

John P. Passarelli, NE #16018
Stephen J. Pedersen, NE #22465
Kutak Rock LLP
1650 Farnam Street
Omaha, NE 68102
john.passarelli@kutakrock.com
stephen.pedersen@kutakrock.com

*Attorneys for Plaintiff Ed Tobergte Associates Company d/b/a Gear 2000*

        /s/ Russell S. Jones, Jr.
        Attorney for Defendant

20