IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ED TOBERGATE ASSOCIATES          )
COMPANY, d/b/a GEAR 2000,         )
                                  )
              Plaintiff,          )
                                  )
       v.                         )        Case No. 08-2290-JWL
                                  )
RUSSELL BRANDS, LLC,              )
                                  )
              Defendant.          )
                                  )
_____  )

## MEMORANDUM AND ORDER

Plaintiff Ed Tobergate Associates Company, which does business as Gear 2000,

holds United States Patent No. 7,168,104 ("the Patent"), which claims the invention of

a type of football shoulder pads. Plaintiff has brought a claim against defendant Russell

Brands, LLC for infringement of the Patent in violation of 35 U.S.C. § 271 and for false

advertising in violation of 15 U.S.C. § 1125 *et seq.*, relating to defendant's manufacture

and sale of its own shoulder pads. Defendant asserts a counterclaim by which it seeks

a declaration of non-infringement and invalidity of the Patent. Defendant has proposed

constructions of various terms in the claims of the Patent, and the parties have submitted

their written arguments concerning those terms. The Court construes those terms as set

forth herein.

## I.     Claim Construction Standards

Claim construction is governed by the methodology set forth by the Federal Circuit Court of Appeals in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  It is a bedrock principle of patent law that the claims of the patent define the patentee's invention.  *Id.* at 1312.  Thus, claim construction begins with the words of the claim itself.  *Id.*  The words of a claim should be given their ordinary and customary meaning as understood by a person of ordinary skill in the art in question at the time of the invention.  *Id.* at 1312-13.  "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."  *Id.* at 1314.  Both "the context in which a term is used in the asserted claim" and the "[o]ther claims of the patent in question" are useful for understanding the ordinary meaning.  *Id.*

The claims do not stand alone, but are part of "a fully integrated written instrument."  *Id.* at 1315.  Therefore, they "must be read in view of the specification, of which they are a part."  *Id.* (quotation omitted).  In fact, the specification is "the single best guide to the meaning of a disputed term" and is often dispositive.  *Id.*  The specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, in which case the inventor's lexicography governs.  *Id.* at 1316.  In other cases, it may reveal an intentional disclaimer or disavowal of claim scope by the inventor; in that case, "the inventor has dictated the correct claim scope, and the inventor's invention, as expressed in the specification, is regarded as dispositive."  *Id.*  The fact that the specification includes limited and specific

2

embodiments is insufficient to define a term implicitly, and it is improper to confine the scope of the claims to the embodiments of the specification. *Id.* at 1323. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quotation omitted).

Moreover, the court must be careful not to import limitations from the specification into the claim. *Id.* at 1323. In walking the "fine line" between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim, the court must "focus . . . on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.* The purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so. *Id.* Reading the specification in context should reveal whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive. *Id.* Thus, the court's task is to determine "whether a person of skill in the art would understand the embodiments to define the outer limits of the claim term or merely to be exemplary in nature." *Id.*

The court should also consult the patent's prosecution history, if in evidence. *Id.* at 1317. Like the specification, the prosecution history "provides evidence of how the PTO [Patent and Trademark Office] and the inventor understood the patent." *Id.* "Yet

because the prosecution represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Finally, the court may consult extrinsic evidence such as expert and inventor testimony, dictionaries, and learned treatises. *Id.* These have all been recognized as tools that can assist the court in determining the meaning of particular terminology. *Id.* at 1318. Extrinsic evidence may be helpful to the court in understanding the technology or educating itself about the invention. *Id.* In particular, because technical dictionaries collect accepted meanings for terms in various scientific and technical fields, they can be useful in claim construction by providing the court with a better understanding of the underlying technology and the way in which one skilled in the art might use the claim terms. *Id.* at 1318. "However, conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Id.* Extrinsic evidence is less reliable than intrinsic evidence in determining the construction of claim terms, and therefore the court should discount any expert evidence that is at odds with the intrinsic evidence. *Id.*

**II.    Construction of Terms in Claim 11 of the Patent**

The parties dispute the construction of four terms found in Claim 11 of the Patent.

That claim reads as follows (with disputed terms underlined):

11.    Football shoulder pads, comprising:

a breathable torso pad member of said shoulder pads having a front

portion, a back portion and a shoulder portion;

said breathable torso pad member further including a foam body having

a hard, inner layer and first and second layers of breathable foam

secured to opposing surfaces of said hard inner layer, said layers

presenting a sandwich configuration;

said hard inner layer having spaced apart openings therethrough to allow

airflow through said torso pad member substantially throughout

its area.

Defendant has proposed constructions for each of the disputed terms in this claim, while

plaintiff argues that the terms do not require further construction.


*A.    "Breathable Torso Pad Member"*

Defendant proposes that the term "breathable torso pad member" found in Claim

11 of the Patent be construed to mean *a torso pad member that allows air or moisture

to flow through the torso pad member throughout its whole area*.

Defendant essentially makes two arguments in support of its construction.  First,

defendant argues that the Patent's specification suggests that the term "breathable" should be construed to mean *allows air or moisture to flow through*. Defendant does not explain why the term "breathable" necessarily requires definition, but plaintiff does not appear to take issue with this portion of defendant's proposed construction. The Patent's specification does not define "breathable" explicitly, but it does appear to equate that term with the ability to allow air or moisture to flow through the shoulder pad. (Patent at 2:6-7, 3:55-59.) That definition of "breathable" is further supported by plaintiff's response to the initial rejection of its patent application by the United States Patent and Trademark Office ("PTO"), by which plaintiff amended this claim to add "breathable" before "torso pad member." The Court believes that defining "breathable" in this manner would be useful to the jury. Accordingly, the Court construes the term "breathable" as used in Claim 11 of the Patent to mean *allowing air or moisture to flow through*.

Plaintiff does take issue with defendant's additional proposed limitation requiring that the flow of air or moisture be *throughout [the torso pad member's] whole area*. Defendant bases this portion of its proposed construction on the Patent's prosecution history, in particular the aforementioned response by plaintiff to the PTO. Defendant argues that plaintiff itself added this limitation in seeking to distinguish prior art (the Bassett patent) in order to overcome the PTO's rejection of this claim of the Patent. The Court does not agree, however, that plaintiff's response compels a construction of this term with the proposed limitation.

In rejecting the initial application, the PTO examiner stated as follows:

[The claims] are rejected under 35 U.S.C. 102(b) as being anticipated by Bassett et al. (US 5,781,935). Bassett et al. (hereinafter Bassett) discloses a protective shoulder pad (20) that includes a foam body having a hard rigid layer (36) being positioned between first and second breathable layers of foam material (38, 42) in a sandwich configuration and has a breathable fabric layer (34, 45) that is secured about the periphery of the pad, col. 3, lines 1 - col. 4, line 15 and as shown in figure 4. Further, the hard rigid inner layer includes spaced openings/perforations therethrough as shown in figure 5 which can inherently be made of plastic. Furthermore, the first and second foam layers are breathable with openings that align with the perforation of the inner layer, col. 4, lines 11-15.

Plaintiff amended its claim to add "breathable" to describe "torso pad member," and it responded to the PTO as follows:

[The claims] stand rejected under 102(b) as being anticipated by Bassett et al (Bassett). In response, [the claims have] been amended. . . . Because the claims as amended recite a breathable protective **pad**, this rejection should be overcome.

The amended claims continue to recite first and second layers of **breathable** foam, a **breathable** fabric layer and a hard layer having spaced apart openings. Now, as amended, the claims further emphasize the breathability of the pad as a whole. More specifically, [the claim] has been amended to explicitly recite a **breathable** protective pad that allows air or moisture to flow **throughout** the pad's area.

The object of the Bassett patent is to provide a pad that cushions not only the wearer but also another person/player coming into contact with the wearer. Col. 1, lines 3-51. Breathability and moisture transfer **across the pad** are not contemplated. In fact, the Bassett patent discloses the opposite: a **nonbreathable** pad **incapable** of air and moisture transfer across the pad's area.

Bassett discloses a **nonbreathable** pad having layers of **nonbreathable** materials. Padding layers 38 and 42 are disclosed as being closed cell type foam, such as VNS, which does not allow air and moisture transfer. The layer 34 is disclosed as being extremely durable and **water-**

7

**resistant** and is applied across the exterior surfaces of the outer and inner layers. Col. 3, lines 49-52. As the detailed description goes on to state, "[b]y fully coating the pad, all surfaces would be **sealed** and **impervious** to external pentrants [sic] as water and sweat." Col. 3, lines 52-54 (emphasis added).

At col. 4, lines 11-15, the Bassett patent contemplates including "cutouts for ventilation or attachment or accessories." As this portion of the disclosure makes clear, such cutouts are not made to provide overall breathability and moisture transfer. In fact, modifying the Bassett pad to include a cutout that would allow air and moisture transfer across the pad's area would effectively eliminate the pad because the pad would become one big cutout. Instead, as the disclosure states, the cutouts allow for straps, hooks and attachment of other pad accessories through the cutout. Nothing suggests that the cutouts would make the **padding** breathable. Put another way, the **cutout** will allow ventilation through the cutout **only**, but the padding still would not provide any air or moisture transfer. As discussed above, the padding is explicitly disclosed as being **sealed** and **impervious** to water and sweat.

Accordingly, because Applicant's breathable pad that allows air and moisture transfer therethrough is not disclosed or suggested by the Bassett patent, the rejection should be overcome.

(Bold type in original.) The PTO examiner then allowed the Patent's claims and amended the record, stating as follows:

[The claims] are allowable because the prior art does not teach or suggest the recitation therein including a football shoulder pad having a breathable torso pad that has a front portion, a back portion and a shoulder portion such that first and second layers of breathable foam layers are secured on opposing surfaces of a hard inner layer in a laminate configuration with the hard inner layer having spaced apart openings therethrough to allow air to flow through the torso pad.

Defendant argues that in distinguishing the Bassett prior art, plaintiff limited its claim by the use in its response of the phrases "breathability of the pad as a whole;" "allows air and moisture to flow **throughout** the pad's area;" and "[b]reathability and

8

moisture transfer **across the pad**" (bold type in original). The Court does not agree, however, that plaintiff's response clearly shows an intent to disclaim patent scope in this manner. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) (statements in prosecution history disavowing claim scope must be both "so clear as to show reasonable clarity and deliberateness" and "so unmistakable as to be unambiguous evidence of disclaimer"). Plaintiff certainly did not disclaim any claim scope explicitly in its response. A review of the entirety of the examiner's rejection and plaintiff's response suggests that plaintiff was seeking to overcome the rejection by pointing out that the Bassett shoulder pads (as opposed merely to the hard layer with cutouts) were not breathable (due to the use of VNS material and a sealant) and were not intended to be so (cutouts were not for breathability of the pad, pad was intended to be impervious); while plaintiff's own shoulder pads or torso pad members (as opposed merely to one or more layers of the pads or members) were breathable. Plaintiff's response does not suggest that plaintiff intended any additional spatial or areal limitation to its claim requiring that the torso pad member (and not merely one or more layers) be breathable.

Moreover, plaintiff also amended its claim to include the requirement of openings in the hard layer to allow airflow "substantially throughout" the torso pad member's area. That amendment supports the conclusion that plaintiff intended no other additional limitations not found in the language of the claim itself.

The Court thus rejects defendant's proposed limitation requiring that the flow of air or moisture be throughout the torso pad member's "whole area." The Court construes

9

"breathable" in Claim 11 to mean *allowing air or moisture to flow through*.


### B.    *"Breathable Foam"*

Defendant next argues that the term "breathable foam" in Claim 11 of the Patent should be construed to mean the following: *A padding material that allows the flow of air or moisture through the padding itself and not merely through a hole or cutout in the padding.  Breathable foam does not include closed cell type foams other than a foam formed of closed cell foam beads fused together where the individual beads meet*.

Defendant emphasizes that the claim uses the term "breathable foam" instead of "breathable layers of foam."  Thus, defendant argues that the plain meaning of "breathable foam" is a material that is itself porous or breathable, and cannot include non-porous, conventional closed cell foam that has been given perforations or cutouts to make that particular layer of foam breathable.  Defendant originally sought to exclude all closed cell foams, but it has amended its proposed construction to permit the use of closed cell foam beads that are fused together (Brock foam constituting one example of such foam) to accommodate the particular foam described by plaintiff in one embodiment and various dependent claims of the Patent.

The Court does not agree that the plain meaning of "breathable foam" suggests such a limitation; nor does the Court see a significant difference between "breathable foam" and "breathable layers of foam."  If a material is porous, then it has openings or holes, however small (or even microscopic) they may be.  The plain meaning of the term

10

"breathable foam" does not necessarily include only materials with openings made by the manufacturer of the foam while excluding materials with openings (perforations or cutouts) made by plaintiff or some other manufacturer of shoulder pads.[1]

The Patent's specification supports a construction of "breathable foam" that would include closed cell foam that has been perforated. Defendant points to the Background section of the specification, which notes that certain types of padding materials, including "a combination of open and closed cell foams," typically do not allow body heat to be released. (Patent at 1:26-33.) That statement, however, refers to both open and closed cell foams, and it does not purport to define "breathable foam" or to effect a clear disclaimer or disavowal of claim scope. Defendant also points to plaintiff's use of fused closed cell foam beads in the specification, but such foam is used in only one embodiment of the claimed invention. (Patent at 3:35-46.) The specification explicitly provides that in an alternative embodiment, the foam layers "can be conventional open or closed cell foams, each layer being punctured with multiple puncture holes therethrough." (Patent at 3:47-50.) The specific use of perforated conventional closed cell foam in one embodiment of the invention in the specification

---

[1]Defendant has not submitted any extrinsic evidence explaining open and closed cell foams that would rebut the Court's understanding and show that open cell foam actually allows for the transfer of air or moisture without containing any microscopic openings at all. Even if such evidence had been submitted, however, the Court would still reject defendant's proposed limitations in light of the specification's explicit inclusion of perforated closed cell foam in one embodiment of the invention, as noted below.

indicates that plaintiff intended to include such foam in using the term "breathable foam" in Claim 11.

Defendant is therefore left with its reliance on plaintiff's response to the PTO's initial rejection of its application. Defendant argues that plaintiff disclaimed this patent scope when, in attempting to distinguish the Bassett patent, plaintiff noted that Bassett used a closed cell foam and that Bassett's cutouts in the hard inner layer did not make its shoulder pads breathable. The Court rejects this argument by defendant. As noted above, a review of plaintiff's response to the PTO reveals that plaintiff distinguished the Bassett patent on the basis that Bassett did not create and did not intend to create a breathable shoulder pad or torso pad member, as plaintiff had. To that end, plaintiff noted that Bassett used a closed cell foam as part of its attempt to make the pad impervious and sealed, and that Bassett's cutouts were not intended to make the shoulder pads breathable, as plaintiff's cutouts were. Plaintiff did not clearly and unmistakably disavow a patent claim that would include perforated conventional closed foam. Therefore, the Court rejects these portions of defendant's proposed construction.

Finally, defendant also appears to substitute "padding material" and "padding" for "foam" in its proposed construction of "breathable foam." Defendant has not explained why "foam" needs further definition; nor has defendant provided any support for its use of "padding" as a synonym. Therefore, the Court rejects that substitution.

Accordingly, subject to the Court's prior construction of the word "breathable", the Court declines to construe further the term "breathable foam" as found in Claim 11

of the Patent.

## C. *"Airflow Through"*

In its original brief, defendant sought a construction of the term "airflow through," which is a part of the following element in Claim 11: "said hard inner layer having spaced apart openings therethrough to allow airflow through said torso pad member substantially throughout its area." Defendant proposed that the term "airflow through" in that context be construed to mean the following: *Circulation of air or moisture, sufficient to effectively ventilate body heat or perspiration from the wearer, through one side of the torso pad, passing into one surface and out of the opposing surface or the padding material of the first and second foam layers, then passing out of the other side of the torso pad.* Defendant argued that the term "airflow through" was a functional term (defining the invention by what it does instead of by what it is), which must be construed as limited by the function of the invention as described in the Patent's specification, in order to answer the question of how much airflow is required by the claim.

Subsequently, in its response to plaintiff's initial claim construction brief (which response was filed after and in reply to plaintiff's response to defendant's initial brief), defendant changed course and argued that because of the ambiguity regarding the amount of airflow required by the claim, this term cannot be construed meaningfully, thereby rendering this portion of the claim fatally indefinite. Thus, defendant has

abandoned the construction proposed in its initial brief.

The Court will not consider defendant's indefiniteness argument at this time. In the introduction section of its initial brief, defendant "note[d]" that this term rendered the claim indefinite and therefore invalid, but it did not include this alleged indefiniteness among the "issues presented" in the brief or address the issue in the argument section of the brief. Instead, defendant merely pointed out that it was not waiving its indefiniteness argument in proposing a construction for the term "airflow through." Thus, plaintiff was not reasonably put on notice that it should address the issue of indefiniteness, and in fact plaintiff did not address the issue in its own responsive brief. Therefore, because defendant has properly raised and argued this point for the first time in its responsive brief, without the opportunity for plaintiff to respond,

the Court does not take up the issue at this time. *See, e.g.*, *U.S. Fire Ins. Co. v. Bunge N. Am., Inc.*, 2008 WL 3077074, at *9 n.7 (D. Kan. Aug. 4, 2008) (court will not consider issues raised for first time in reply brief) (citing *Minshall v. McGraw Hill Broadcasting Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003)). Therefore, the Court will address the construction initially proposed by defendant, despite its apparent abandonment by defendant.

As explained above, defendant argues that the term "airflow through" must be limited by reference to the function of the invention as set forth in the specification.

Defendant has not cited any authority that supports such a construction, however.[2] As defendant concedes, the plain meaning of "airflow" is "the flow of air;" thus, defendant has not shown that further construction is required. Moreover, the "amount" of airflow required is addressed by the remainder of the claim element, which provides for openings to allow airflow "substantially throughout [the torso pad member's] area."

Accordingly, the Court rejects the construction initially proposed by defendant and concludes that this term does not require further construction.[3]

### D. "Substantially Throughout Its Area"

Defendant argues that the term "substantially throughout [the torso pad member's] area" should be construed to mean *essentially everywhere in the torso pad*.

Defendant repeats its arguments based on the prosecution history of the Patent relating to breathability of the pad "as a whole" and "throughout the pad's area." The Court has already concluded that plaintiff did not clearly and unmistakably disclaim or disavow claim scope in its response to the PTO.

---

[2]The cases cited by defendant relate to the issue of indefiniteness and not to claim construction. *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008); *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1348-56 (Fed. Cir. 2005).

[3]Even if the Court were to look to the specification to limit this term by reference to the invention's function, the Court does not agree that the limitation should go beyond the function of allowing the flow of air or moisture to or away from the body; thus, the Court would reject defendant's description of the function as requiring "effective ventilation" or that air or moisture actually travel the entire width of the torso pad.

Defendant also bases its construction on dictionary definitions of "substantially" to mean *essentially* and "throughout" to mean *everywhere*. Defendant has not indicated why those words cannot stand on their own without definition, however. The only possible ambiguity identified by defendant relates to whether conventional closed cell foam may be used, and the Court has already rejected that argument by defendant. Defendant has not shown that this term is reasonably subject to multiple interpretations or that one reasonably schooled in the art would not understand the term without further definition. Accordingly, the Court concludes that the term "substantially throughout its area" does not require further construction.

### III.    Construction of Means Plus Function Elements

Defendant has also proposed constructions for "means-plus-function" elements contained in four dependent claims of the Patent. Section 112 of federal patent law provides as follows:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. In construing a means-plus-function limitation, the Court undertakes a two-step analysis:

> First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent that performs that function.

*Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006) (citations omitted). Plaintiff does not dispute that the elements for which defendant proposes construction are means-plus-function limitations under section 112.

### A.   Claim 12

Claim 12 of the Patent claims as follows:

12.   Football shoulder pads as claimed in claim 11 further comprising:

an adjustable cap pad extending from said shoulder portion;

means for reasonably securing said cap pad at said shoulder portion.

Defendant would construe the "means" element of Claim 12 as follows: *A strap and a loop, the strap attached at one end to the upper end of the cap pad, the loop secured to the shoulder portion of the torso pad, where a free end of the strap is adapted to extend through the loop and be secured to itself (the strap) by hook and loop tape.* In response, plaintiff objects only to defendant's requirement that the strap be attached to the "upper end" of the cap pad and not merely to the cap pad generally. Plaintiff would also include "and equivalents thereto" at the end of the construction to echo the language of section 112.

Plaintiff argues that the inclusion of the "upper end" language would make Claim 12 narrower than dependent Claim 20, which describes this structure with reference to attachment to one end of the cap pad, and not to attachment to the upper end. Claim 12 itself does not include any description of the structure for performing the claimed

function, however, and plaintiff has not disputed that this limitation in the claim represents a means-plus-function element subject to section 112. Plaintiff has not explained why the Court should not follow the Federal Circuit's two-step method for construction of such a claim element, which requires that the Court turn to the specification for a description of the structure that corresponds to the claimed function. The Patent's specification does describe this structure as including a strap extending from the top edge of the cap pad. (Patent at 4:52-5:10.) Therefore, the Court adopts defendant's proposed construction, with plaintiff's addition of the "equivalents" language of the statute.

Accordingly, the Court construes the "means" element of Claim 12 to mean *a strap and a loop, the strap attached at one end to the upper end of the cap pad, the loop secured to the shoulder portion of the torso pad, where a free end of the strap is adapted to extend through the loop and be secured to itself (the strap) by hook and loop tape, and equivalents thereto.*

### B.     Claim 13

Claim 13 of the Patent claims as follows:

13.   Football shoulder pads as claimed in claim 11 further comprising:

an adjustable cap pad extending from said shoulder portion;

means for securing said cap pad to a wearer's arm, said cap pad thereby

providing protection to the wearer's arm with movement thereof

18

in any direction.

Thus, while Claim 12 included the means for securing the cap pad to the shoulder portion, Claim 13 includes the means for securing the cap pad also to the wearer's arm. Defendant proposes the following construction of this means-plus-function element: *A nylon covering that encloses two cap pads with a stitched area separating the two pads to form a hinge, which covering has an elastic strap stitched to its outside edges adjacent the lower end of the lower cap pad in a position to extend across the width of the lower cap pad*. Plaintiff proposes a much shorter construction: *A cap pad that has an elastic strap stitched to its lower end in a position to extend across the width of the lower cap pad and equivalents thereto*.[4]

Thus, plaintiff objects to the portion of defendant's construction describing a nylon covering of the cap pad. The specification describes the manner in which the cap pad is secured to the wearer's arm as follows:

> The cap portions 70 and 72 are each discrete pads, but are covered by the same nylon covering. The covering is stitched together between the cap portions 70 and 72 to present a hinge 73. The lower cap portion 72 is substantially trapezoidal and includes a lower elastic strap 76 which extends across the width of the lower cap portion 72 from one side thereof

---

[4]Plaintiff did not propose any constructions for the means-plus-function elements in its initial brief, instead arguing that no construction was necessary and that each such element "must be construed to cover each corresponding structure, material, or act described in the specification and each equivalent thereof." Plaintiff did offer specific constructions in its response to defendant's claim construction brief. Defendant has not argued that such proposed constructions may not be considered, and defendant did respond to plaintiff's proposals in its own later-filed response brief. Accordingly, the Court will consider plaintiff's constructions.

to the other side adjacent the free end of the lower cap portion 72. The ends of the elastic strap 76 are stitched to the lower cap portion's nylon covering. The elastic strap 76 wraps around the athlete's upper arm to maintain the cap pads 28 and 30 in position over the athlete's upper arm. See FIG. 1. Thus, the cap pads 28 and 30 can be secured to the athlete's upper arm to ensure the padding moves with the arm regardless of the direction of movement.

(Patent at 4:38-51.)

The Court first concludes that defendant's proposed construction improperly assumes a cap pad having discrete upper and lower portions (parts 70 and 72). Claims 12 and 13 claim a cap pad in the singular. Immediately prior to the above excerpt, the specification makes clear that although the figures show a cap pad with an upper and lower cap portion, "other shoulder pad models, such as quarterback shoulder pads, may only include cap pads having an upper cap portion 70." (Patent at 4:28-37.) Thus, the description of the structure from the specification must be broad enough to accommodate both types of cap pads. Defendant's proposed construction therefore improperly includes elements, such as the requirement of two cap pad portions and the reference to the hinge between pads, that relate only to one type of cap pad.

Plaintiff's construction does not contain any reference to the nylon covering to which the strap is attached in the specification's description. Although the specification does not explicitly address the point, it appears that both types of cap pads (having either one or two portions) include a nylon covering. Therefore, the Court agrees with defendant that the proper construction should include the attachment of the strap to the nylon covering and not merely to the cap pad.

Accordingly, based on these conclusions and the specification's description of this structure, the Court construes this element in Claim 13 as follows: *An elastic strap that extends across the width of the cap pad and whose ends are stitched to the cap pad's nylon covering, and equivalents thereto*.

### C. Claim 15

Claim 15 of the Patent claims as follows:

15. Football shoulder pads as claimed in claim 11, further comprising:

an outer arch secured over said shoulder portion and having a means

for accessorizing the football shoulder pads secured to said

outer arch.

Plaintiff does not dispute defendant's proposed construction of the "means" element of Claim 15 (except to propose the addition of the "equivalents" language). Accordingly, the Court construes the "means" element of Claim 15 as follows: *A screw extending through the outer arch and secured to the outer arch by a t-nut which extends into the outer arch from the inner surface of the outer arch, and equivalents thereto*.

### D. Claim 16

Claim 16 of the Patent claims as follows:

16. Football shoulder pads as claimed in claim 11, further comprising:

a means for accessorizing the football shoulder pads secured to said

torso pad member.

Defendant would construe the "means" element of this claim as follows: *Extruded vinyl or plastic flaps positioned adjacent the lower edge of each torso half with slots and/or holes through the flaps for receiving attachments hooked therein, which flaps are riveted across their length adjacent the flap's top edge, with the rivets extending through the outer foam layer to the inner plastic layer.* Plaintiff would construe this element as follows: *A screw extending through the outer arch and secured to the outer arch by a t-nut which extends into the outer arch from the inner surface of the outer arch and equivalents thereto and/or extruded vinyl or plastic flaps riveted across the length thereof and adjacent each flap's top edge through the outer foam layer to the inner plastic layer with slots and/or holes therethrough and equivalents thereto.*

The basic difference between the parties' positions is that plaintiff would also include, as an alternative for the function in Claim 16 (accessorizing to the torso pad member), the structure used for performing the function in Claim 15 (accessorizing to the outer arch). The specification describes an outer arch extending over the shoulder pads that is riveted to the shoulder portions of the torso halves. Accessory attachments (part 60) are preferably secured to the outer arches, by means of the structure described above with respect to claim 15 (which claims a means for accessorizing to the outer arch). (Patent at 3:60-4:11.) The specification then notes that some players may need different protections, such as rib pads, that "preferably do not include accessory attachments 60 but include accessory attachments 61." The specification then describes

22

the structure for accessory attachments 61, which is positioned "adjacent the lower edge of each torso half." (Patent 4:12-27.)

Plaintiff argues that either part 60 or part 61 may be used "for accessorizing the football shoulder pads secured to said torso pad member," and that the corresponding structure must therefore allow for the use of either part. Defendant, on the other hand, argues that part 60 performs the function in Claim 15 (relating to the outer arch) while part 61 performs the function in Claim 16 (relating to the torso pad member). Thus, the issue is whether the "torso pad member" (to which accessories are attached in Claim 16) encompasses the "outer arch" (to which accessories are attached in Claim 15). The parties have not addressed this specific question.

The Court concludes that "torso pad member" does not include the "outer arch." Claim 11 effectively defines "torso pad member" when it claims "a breathable torso pad member . . . having a front portion, a back portion and a shoulder portion." Claim 15 claims an outer arch secured over the shoulder portion mentioned in Claim 11. The specification describes the outer arches as extending over the outside surface of the mesh (which covers the torso halves) at the shoulder portions and riveted to the shoulder portions. (Patent at 3:60-63.) Thus, the outer arch is described as distinct from the shoulder portion that is a part of the torso pad member, and is nowhere described as a part of the torso pad member. Moreover, parts 60 and 61 are clearly distinct structures, and the juxtaposition of Claims 15 and 16 suggest that those means were intended to refer to parts 60 and 61 respectively, without overlap. Therefore, the Court concludes

23

that the "means" element of Claim 16 should be construed only by reference to part 61 as described in the specification.

The parties' descriptions of the part 61 structure vary in a few respects not discussed by the parties in their briefs. After reviewing the description in the specification, the Court construes the "means" element of Claim 16 as follows: *Extruded vinyl or plastic flaps riveted across the length thereof and adjacent each flap's top edge through the outer foam layer to the inner plastic layer, with slots and/or holes therethrough within which accessories may be hooked, which flaps are positioned adjacent the lower edge of each torso half, and equivalents thereto.*

IT IS THEREFORE ORDERED BY THE COURT THAT certain terms in the patent at issue in this action are construed as set forth herein.

IT IS SO ORDERED.

Dated this 5th day of November, 2009, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge